483 A.2d 1242

## In re Formal Inquiry Concerning Judge Stanley Y. BENNETT.

**Misc. Judicial Disabilities No. 1, Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 26, 1984.

518

John Wheeler Glenn, Baltimore (Leroy W. Preston and O'Connor, Preston, Glenn & Smith, P.A., Baltimore, on "Arguments of Fact and Law"), for respondent.

Charles O. Fisher, Westminster, for petitioner.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

SMITH, Judge.

For the second time in Maryland history we shall be obliged to remove a judge from office. *See In Re Diener and Broccolino*, 268 Md. 659, 304 A.2d 587 (1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974), for the earlier such instance and the background for our current constitutional provision.

Acting pursuant to Md. Const. art. IV, § 4B and Maryland Rule 1227, the Commission on Judicial Disabilities formally notified Judge Stanley Y. Bennett of the District Court of Maryland, District II, sitting in Frederick County that he was charged with a number of violations of the Canons of Judicial Ethics and the Rules of Judicial Ethics. The following facts pertinent to this opinion were alleged:

> "1. That ... [Judge Bennett] made promises or statements to Mr. Marion Rice and/or members of his family indicating that ... [the judge] would assist in or attempt to obtain a revised disposition of a guilty verdict which

**520**

had been entered against Randy Marion Demaris by Judge Mary Ann Stepler on April 6, 1982 with respect to Citation No. 7540135 in the District Court of Maryland. "2. Knowing that Randy Marion Demaris had been found guilty of a traffic offense by another judge, ... [Judge Bennett] advised a supporter of ... [his] campaign for election to the Circuit Court that ... [the judge] would 'look into' the matter, or words to that effect. "3. That in June, 1982 ... [the judge] prepared or caused to be prepared an Exception Report with respect to Citation No. 7540135 and did forge or caused to be forged or aided and assisted in the forgery of the signature of Judge Stepler thereto."

The Commission held extensive hearings. It filed an opinion, the pertinent parts of which not otherwise set forth in this opinion are reproduced in an appendix to this opinion. It concluded that Judge Bennett violated Canons IV, XIII, XXIX, and XXXIII of the Canons of Judicial Ethics as well as Rules 1 and 15 of the Rules of Judicial Ethics as promulgated in Rule 1231.[1] The opinion said:

---

1. Canons IV, XIII, XXIX, and XXXIII state:

"IV.

"Avoidance of Impropriety

"A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach."

"XIII.

"Kinship or Influence

"A judge should not act in a controversy in which a near relative is party, witness, or lawyer; he should not suffer his conduct to justify the impression that any person can improperly influence him or unduly enjoy his favor, or that he is affected by the kinship, rank, position, or influence of any party or other person. He should not testify voluntarily as a character witness."

"XXIX.

"Candidacy for Office

"A candidate for judicial position should not make or suffer others to make for him, promises of conduct in office which appeal to the cupidity or prejudices of the appointing or electing power; he should not announce in advance his conclusions of law on disputed

## *"Findings of Fact*

"The Commission, based on clear and convincing evidence, finds as fact that:

"a. There was no attempt to 'frame' Judge Bennett so as to cause him to lose the judicial contest for a seat on the Frederick County Circuit Court.

"b. Marion 'Pus' Rice approached Judge Bennett and asked him to see what he could do to remove the traffic violation from Randy M. Demaris' driving record.

---

issues to secure class support, and he should do nothing while a candidate to create the impression that if chosen, he will administer his office with bias, partiality or improper discrimination.

"While holding a judicial position he should not become an active candidate either at a party primary or at a general election for any office other than a judicial office. If a judge should decide to become a candidate for any office not judicial, he should resign in order that it cannot be said that he is using the power or prestige of his judicial position to promote his own candidacy or the success of his party.

"If a judge becomes a candidate for any judicial office, he should refrain from all conduct which might tend to arouse reasonable suspicion that he is using the power or prestige of his judicial position to promote his candidacy or the success of his party.

"He should not knowingly permit others to do anything in behalf of his candidacy which would reasonably lead to such suspicion."

"XXXIII.

"A Summary of Judicial Obligation

"In every particular his conduct should be above reproach. He should be conscientious, studious, thorough, courteous, patient, punctual, just, impartial, fearless of public clamor, regardless of public praise, and indifferent to private political or partisan influences; he should administer justice according to law, and deal with his appointments as a public trust; he should not allow other affairs or his private interests to interfere with the prompt and proper performance of his judicial duties, nor should he administer the office for the purpose of advancing his personal ambitions or increasing his popularity."

Rules 1 and 15 state:

"1. An aggravated or persistent failure to comply with the Canons of Judicial Ethics shall be deemed a rule violation."

"15. Violation of any of these rules by a judge to whom the rule applies is conduct prejudicial to the proper administration of justice within the meaning of Maryland Rule 1227 (Censure, Removal or Retirement of Judges)."

"c. The matter of Demaris' driving record was of singular importance to Rice.

"d. Being elected to the Circuit Court was of prime importance to Judge Bennett, and he sought the favor and political support of 'Pus' Rice.

"e. As a result of Rice's importuning, Judge Bennett did make promises to Rice and or members of Rice's family indicating that he would assist in an attempt to obtain a revised disposition of the guilty verdict entered by Judge Stepler against Randy M. Demaris on April 6, 1982, on traffic citation No. 7540135.

"f. Judge Bennett, knowing that Randy M. Demaris had been found guilty of a traffic offense, advised Rice, a campaign supporter, that he, Judge Bennett, would 'look into' the matter, thus implying to Rice and his family that the judge would use his office in an effort to delete the violation from the records of Randy M. Demaris so that Demaris could obtain a driver's license from the Motor Vehicle Administration.

"g. Judge Bennett did, sometime during the period June 17, 1982, to June 23, 1982, trace forge the signature of Judge Mary Ann Stepler to the Exception Report (Commission Exhibit No. 17), or he did cause her signature to be trace forged on the Exception Report (Commission Exhibit No. 17).

"We make clear that as to the findings of fact in paragraphs 'a' and 'g' that the Commission so decided by a vote of 6 to 1. The Commission was unanimous with respect to all other factfindings."

It was the unanimous recommendation of the Commission that Judge Bennett be removed from office.

Judge Bennett filed the following exceptions:

"1. The Commission erred in having failed to grant the Motion to Dismiss filed by Respondent prior to the evidentiary hearing, on the issue of collateral estoppel/double jeopardy/res judicata on the basis of a Grand Jury having refused to indict the Respondent herein on the same evidence which was to have been presented to the Commission.

"2. The Commission erred in having failed to properly rule that there was 'sufficient cause to warrant further proceedings', i.e., formal hearing, pursuant to Rule 1227, [f], 4, upon determination that the statement or complaint which generated this inquiry was not 'verified'.

"3. Upon a review of the evidence presented, the evidence does not support, by clear and convincing weight, a conclusion that the Respondent forged or aided in the forgery of the Exception Report.

"4. The conclusion of the Commission that the Respondent forged or aided in the forgery was against the weight or [sic] the evidence.

"5. The Commission Chairman erred in having permitted, over objection, Corporal Irvin Lambdin, to return to the witness stand, two days after his original testimony, and change his testimony.

"6. The Commission Chairman erred in permitting testimony from Barbara Day, the last witness called by the Commission, when she was not identified as a witness who would be called by the Commission."

We shall discuss each exception but not in the order in which they appear.

### 1. The Collateral Estoppel/Double Jeopardy/Res Judicata Issue

The grand jury of Frederick County was called into special session after the allegations here arose. Evidence pertaining to this matter was presented to it. It appears that it received evidence similar to that placed before the Commission. It failed to return any indictments. This failure generates the argument in the first exception.

Before there can be double jeopardy there must be jeopardy. Bennett was not placed in jeopardy when a grand jury considered whether it should return an indictment. There is nothing to prevent a subsequent grand jury from indicting him. It is generally held with respect to a jury trial that a defendant is placed in jeopardy when the jury is selected and sworn and as to a non-jury trial when the judge begins to hear or receive evidence. *Blondes v. State,* 273 Md. 435, 444, 330 A.2d 169, 173–74 (1975). Hence, there can be no double jeopardy here. Moreover, in the analogous situation of an attorney grievance proceeding we said in *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 318, 329 A.2d 1, 7 (1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1397, 43 L.Ed.2d 654 (1975), "[W]e hold that this proceeding is not a 'criminal case' within the purview of . . . the Fifth Amendment to the Constitution of the United States." This proceeding is not a criminal case.

Res judicata and collateral estoppel were discussed in *Cook v. State,* 281 Md. 665, 381 A.2d 671, *cert. denied,* 439 U.S. 839, 99 S.Ct. 126, 58 L.Ed.2d 136 (1978). There Judge Levine said for the Court:

"It is beyond question that the closely related doctrines of res judicata and collateral estoppel apply to criminal as well as civil causes. *Rouse v. State,* 202 Md. 481, 486, 97 A.2d 285, *cert. denied,* 346 U.S. 865 [74 S.Ct. 104, 98 L.Ed. 376] (1953); *State v. Coblentz,* 169 Md. 159, 164–66, 180 A. 266 (1935); *see also United States v. Oppenheimer,* 242 U.S. 85, 87, 37 S.Ct. 68 [69], 61 L.Ed. 161 (1916). *See generally* Annot. 9 A.L.R.3d 203 (1966). Suffice it to say that under the doctrine of res judicata, sometimes known as direct estoppel, a final and valid judgment rendered in one proceeding between two parties operates as a bar in a second proceeding between them on all matters that have been or could have been decided in the original litigation, where the second proceeding involves the same subject matter as the first cause of action. *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977); *Sterling v. Local 438,* 207 Md. 132, 140–41, 113 A.2d 389,

*cert. denied,* 350 U.S. 875 [76 S.Ct. 119, 100 L.Ed. 773] (1955). On the other hand, where a prior judgment is relied upon to preclude a second adjudication of some previously determined factual or legal issue in subsequent litigation between the same parties concerning a different cause of action, courts apply the doctrine of collateral estoppel. *MPC, Inc. v. Kenny,* 279 Md. at 32–33 [367 A.2d 486]. *See also Wash. Sub. San. Comm'n v. TKU Associates,* 281 Md. 1, 18–19, 376 A.2d 505 (1977). Under this latter doctrine, once an issue of ultimate fact has been determined by a final and valid judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189 [1194], 25 L.Ed.2d 469 (1970); *Cousins v. State,* 277 Md. 383, 398, 354 A.2d 825, *cert. denied,* 429 U.S. 1027 [97 S.Ct. 652, 50 L.Ed.2d 631] (1976)." 281 Md. at 668–69, 381 A.2d at 673 (footnote omitted).

As Judge Davidson pointed out for the Court in *Powers v. State,* 285 Md. 269, 283–84, 401 A.2d 1031, *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979), in a criminal context, "[T]he primary purpose of the doctrine of collateral estoppel is to protect an accused from the unfairness of being required to relitigate an issue which has once been determined in his favor by a verdict of acquittal." The doctrine is not applicable here. The failure of the grand jury to indict is not a binding final judgment.

We hold that the failure of the grand jury to indict Judge Bennett does not prevent the bringing of charges by the Judicial Disabilities Commission.

2. The Alleged Failure of the Commission to Rule That There Was "Sufficient Cause to Warrant Further Proceedings ...."

The investigation of Judge Bennett began when the Chief Judge of the District Court of Maryland brought to the attention of the Judicial Disabilities Commission allegations that there had been a forgery of a court docu-

ment changing the disposition in a motor vehicle case. Rule 1227 f 1 provides that the Commission, "upon receiving a verified statement, not obviously unfounded or frivolous, alleging facts indicating that a judge has committed acts constituting misconduct in office ... shall make a preliminary investigation to determine whether formal proceedings should be instituted and a hearing held." The letter from the Chief Judge of the District Court was not verified. However, Rule 1227 f 2 provides, "The Commission without receiving a verified statement may make such a preliminary investigation on its own motion." The Commission complied with Rule 1227 f 3 pertaining to notice by giving Judge Bennett notice under date of February 28, 1983, that it was "making a preliminary investigation to determine whether formal proceedings should be instituted" against him, setting forth the "areas of alleged conduct" which were said to constitute violations of the Canons or Rules of Judicial Ethics. Under date of May 1, 1983, formal notice was given to him that the Commission had "made and completed a preliminary investigation on its own motion pursuant to Maryland Rule 1227(f)(2)" and "ha[d] instituted formal proceedings to inquire into the matters [t]here[in]after set forth." Rule 1227 f 4, to which Bennett alluded in his exception, requires a majority of the members of the Commission to be present at a hearing. It apparently is the belief of Bennett that the record should reflect that the Commission met and formally approved the charges against him. The formal complaint is evidence of this. "There is a strong presumption that public officers properly perform their duties." *Lerch v. Md. Port Authority*, 240 Md. 438, 457, 214 A.2d 761, 771 (1965). Such a presumption is equally applicable to a commission such as this.

We deem this contention to be without merit.

### 3. The Witnesses

#### a. Corporal Lambdin

Corporal Irvin J. Lambdin of the Maryland State Police had testified extensively in this proceeding. He was re-

called because certain of the members of the Commission had some questions they wished answered. His earlier testimony was that the forgery was with a blue ink pen. Judge Bennett, according to the evidence, always used black ink. The transcript of that further testimony covers twenty-five pages. The only objection on behalf of Bennett to be found in any of those pages of the transcript came when Mr. Fisher on behalf of the Commission was well into his examination of Lambdin. The record reflects:

"Q. Now, looking at the exception report, the typing was in what kind of ink?

"A. That's the black ink.

"Q. And the signature?

"A. That appears to be a black or darker blue than was on the exception report.

"MR. GLENN: Objection. Mr. Fisher is trying to impeach his own witness.

"CHAIRMAN GILBERT: Overruled."

■ In *Von Lusch v. State,* 279 Md. 255, 264, 368 A.2d 468, 473 (1977), we said, "[W]here counsel clearly states specific grounds for an objection without a request by the trial court, he waives the right to challenge the evidence on other grounds ...." The ordinary rules of evidence do not apply in a proceeding before the Judicial Disabilities Commission. In *Diener,* 268 Md. 659, 304 A.2d 587, Judge McWilliams said for the Court:

"[I]t suffices to say that the Commission, functioning as a fact-finding body, was not bound by strict rules of evidence, but only by the fundamental rules of fairness, *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A.2d 578 (1966); *Dal Maso v. Board of County Comm'rs of Prince George's County,* 238 Md. 333, 209 A.2d 62 (1965)." 268 Md. at 682, 304 A.2d at 599–600.

■ All factors considered, we find no breach of the "fundamental rules of fairness." Accordingly, we hold this contention to be without merit.

### b. Barbara Day

■ Barbara Day, criminal investigator for the State's Attorney for Frederick County, the last witness called to support the complaint, was not among the witnesses listed before the beginning of the hearing. After discussion between counsel and members of the Commission relative to counsel's objection to the testimony of this witness, inquiry was made of the attorney for Bennett as to whether he needed time to speak to the witness. He replied, "No. Admittedly, I know what she is going to say." · Under those circumstances if there were error we deem it harmless. Were this a criminal case we would say that it was harmless beyond a reasonable doubt. ·

### 4. Sufficiency of the Evidence

Rule BV 10 d pertaining to disciplinary actions against attorneys provides that "[f]actual findings shall be supported by clear and convincing evidence." No similar provision is found in Rule 1227 applicable here. In *Diener*, 268 Md. 659, 304 A.2d 587, the Court said:

"We have made an independent review of the entire record, and we think its conclusion is supported by clear and convincing evidence, which, in our judgment, is the proper test to be applied in these circumstances. *See In re Farris* [229 Or. 209], 367 P.2d 387, 392 (1961). It is clear, we think, that the Commission is not within the ambit of the Administrative Procedure Act, Code (1971 Repl.Vol.), Art. 41, § 244(a), and that proceedings before it are neither civil nor criminal in nature; they are merely an inquiry into the conduct of a judicial officer the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual. *In re Kelly*, 238 So.2d 565, 569 (Fla.1970); *Memphis & Shelby County Bar Association v. Vick*, 290 S.W.2d 871, 875, 40 Tenn. App. 206 (1955). Nevertheless, we. are fully persuaded that the severity of the impact of the Commission's findings upon the individual compels the application of

the clear and convincing test." 268 Md. at 670, 304 A.2d at 594.

As indicated in *Diener,* similar standards have been applied elsewhere. *See, e.g., Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 275, 110 Cal.Rptr. 201, 515 P.2d 1 (1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *In Re Hanson,* 532 P.2d 303, 308 (Alaska 1975); *In Re Crowell,* 379 So.2d 107, 109 (Fla.1979); *In Re Rome,* 218 Kan. 198, 206, 542 P.2d 676 (1975); *Matter of Cieminski,* 270 N.W.2d 321, 326 (N.D.1978); *In Re Jordan,* 290 Ore. 303, 307, 622 P.2d 297 (1981); *Matter of Heuermann,* 90 S.D. 312, 317, 240 N.W.2d 603 (1976).

In *Berkey v. Delia,* 287 Md. 302, 320, 413 A.2d 170, 178 (1980), we adopted the definition of clear and convincing evidence enunciated by Judge Orth for the Court of Special Appeals in *Whittington v. State,* 8 Md.App. 676, 679, n. 3, 262 A.2d 75, 77, n. 3 (1970): "more than a preponderance of the evidence and less than evidence beyond a reasonable doubt . . . ."

■ Judge Bennett argues strongly that clear and convincing evidence has not been adduced to sustain the charges against him. A proceeding such as this is analogous to an attorney grievance proceeding. In each case we must make the ultimate findings of fact but in neither case do we hear the testimony, it being heard by others. In the analogous situation of a conflict in evidence before a three-judge hearing panel, as was then required in attorney disciplinary proceedings, Judge Digges said for the Court in *Bar Ass'n v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973):

"In resolving this conflict in the testimony, we consider the findings of fact of the hearing court in support of its recommendation to have, before us, a similar force and effect to those contained in a master's report in equity. *See In Re Member of Bar,* 226 A.2d 705 (Del.1967). Previous opinions of this Court have discussed the importance to be attached to the findings of fact in a master's report by the ultimate trier of fact. In those cases we

have said that although the report is only advisory, the court should give full consideration to it, particularly with respect to the credibility of witnesses, where the testimony is conflicting. And, the master's findings of fact from the evidence are prima facie correct and they will not be disturbed unless determined to be clearly erroneous. *Bris Realty v. Phoenix,* 238 Md. 84, 89, 208 A.2d 68 (1965); *Alexander v. Hergenroeder,* 226 Md. 559, 560, 174 A.2d 580 (1961); *Pinkston, Tr. v. Higham,* 224 Md. 513, 522, 168 A.2d 712 (1961); *Maryland Lumber Co. v. White,* 205 Md. 180, 196, 107 A.2d 73 (1954)." 269 Md. at 515–16, 307 A.2d at 680.

We have continued to make similar observations. *See, e.g., Attorney Griev. Comm'n v. Collins,* 295 Md. 532, 550, 457 A.2d 1134 (1983); *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336 (1981); *Attorney Griev. Comm'n v. Willcher,* 287 Md. 74, 77, 411 A.2d 83 (1980). We follow the *Marshall* rule here.

The fact that the evidence here is circumstantial is no bar. In a criminal context, a capital case, we said in *Gilmore v. State,* 263 Md. 268, 283 A.2d 371 (1971), *modified on other grounds,* 408 U.S. 940, 92 S.Ct. 2876, 32 L.Ed.2d 763 (1972):

"We find relevant much of what was said by Judge Orth for the Court of Special Appeals in *Nichols v. State,* 5 Md.App. 340, 247 A.2d 722 (1968), where he said:

'The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused. * * *

' * * * In considering the evidence the lower court was guided by established rules of law. Proof of guilt beyond all doubt has never been required. *Young v. State,* 4 Md.App. 286 [242 A.2d 562]. To prove guilt beyond a reasonable doubt it is not necessary that every conceivable miraculous coincidence consistent

with innocence be negated. *Hayette v. State,* 199 Md. 140, 144 [85 A.2d 790]. The lower court could weigh the evidence and determine the credibility of the witnesses. *Roeder v. State,* 4 Md.App. 705 [244 A.2d 895]; *Gibson v. State,* 4 Md.App. 222 [242 A.2d 204]. It was under no obligation to believe the appellant's denials or explanations. *Eley v. State,* 4 Md.App. 230 [242 A.2d 175]; *Tillery v. State,* 3 Md.App. 142 [238 A.2d 125]. It could weigh the alibi testimony and was not required to accept its truthfulness. *Logan v. State,* 1 Md.App. 213 [228 A.2d 837]. And if we assume that the evidence against the appellant was solely circumstantial, such assumption would not change the result. The lower court could have properly found that the circumstances, taken together, were inconsistent with, or such as to exclude every *reasonable* hypothesis or theory of innocence. "[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand * * *. It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors. The rule does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt." 3 *Wharton's Criminal Evidence* (12th Ed.1955) § 980, p. 477. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively. 1 *Underhill's Criminal Evidence* (5th Ed.1956) § 17, p. 23 and p. 25.' *Id.* at 350–51. (Emphasis in original.)"
263 Md. at 292–93, 283 A.2d at 383–84.

■ We have made an independent review of the entire record. On direct examination Judge Bennett was interrogated relative to the exception report. The record at that point is:

"Q. When, if ever, did you get involved in a conversation further about the exception report?

"A. Well, I don't know if it was that day or the next day, but it wasn't very long after, walking to my chambers past Judge Stepler's chambers, she called me to her office and wanted to talk to me about the exception report.

"Q. Now, up to this point, has anything been said by anybody about it having been found on the floor by a janitor?

"A. It runs in mind, Mr. Glenn, that I may have mentioned that in the staff area, not by saying—well, let me put it this way. I believe either Mrs. Schell or Mrs. Weddle, or somebody in the conversation, mentioned the fact that it had been found on the floor or found on the desk. And the word 'found' seems to ring a bell.

"And that triggered in my mind that it might have something to do with what I just vaguely remembered involving the janitor sometime prior to that."

At another point in response to questioning from his attorney Judge Bennett said:

"When asked by the State Police to help them in trying to get all the information available, it occurred to me that I had seen the janitor cleaning up in the staff area, as he did frequently, about closing time, and that he may have picked something up or at least had something in his hand which appeared to me to be an exception report, which I had recalled being placed on a desk in the area where Mrs. Weddle and Mrs. Schell are located."

At still another point on direct examination the record is:

"Q. Now, what, if anything, do you now associate the questions by Stepler about the exception report with what you saw the janitor doing on that prior occasion?

"A. Well, like I said a minute ago, it appeared to me that he had in his hand something like this exception report and that he put it on a desk. He didn't put it in a

waste can. He didn't put it in a garbage bag. But he put it on a desk."

At yet another point on direct examination the record reflects:

"Q. Were you close enough to have seen whether it was signed or not?

"A. Well, as I recall, and I think I recall then it looked like it had the signature on it. It did not look like it was mine. I think I, like everyone else, can recognize my own signature from quite a distance.

"Q. What, if any, indecisiveness on the janitor's part as to what to do with this that he may have communicated to you either verbally or non-verbally?

"A. I don't recall the janitor saying a word. I just got the feeling from the way he was holding the paper that—and looking in my direction, like he was depending upon me to make some direction or say something. I don't know if I pointed to the desk or said, 'Put it on the desk,' or what happened. I do remember at the time I was leaving the staff area.

"Q. And that's the last of that episode, the end of that? Nothing else of significance occurs?

"A. No, I can't recall anything else."

On cross-examination the record reflects:

"Q. And you also said that you recognized the signature, but it wasn't yours. You saw it was signed and it wasn't your signature.

"A. That's correct.

"Q. Now, you testified before the grand jury, didn't you?

"A. That's correct.

"Q. About this exception report.

"A. That's correct.

"Q. Okay, and they are talking about the exception report, now, question, reading from page 450, line 20:

'Okay, and I realize, again, that this is just one piece here; but you looked at it, and what did you do?

'Answer: What did I do?

'Question: Right. You must have said something, your honor.

'Answer: I think I said, "Put it on the desk." '

"This is your colloquy with Gary Miller. Do you remember that?

"A. Yes.

"Q. Question is:

'Okay, and did you tell him what it was?

'Answer: Did I tell him?

'Question: Right.

'Answer: No, I did not.

'Question: Okay, did you know what it was?'

"Then, 'Answer: I thought I knew what it was, because the exception report is approximately the same size of a citation; and it's much different because of the several widely-spaced lines that are on the bottom third of the document.

'Question: Okay, now, judge, could you see a signature on that when you talked to Mr. Miller?

'Answer: I don't recall seeing the signature or anything on the report at all.'

"Now you tell us here today that you saw a signature and you knew it wasn't yours so you assumed it was Judge Stepler's; is that right? [2]

"A. That's right.

"Q. Which is correct, your testimony in August, 1982, or your testimony here today?

"A. I think they are both right, Mr. Fisher.

"Q. You think they are both right, you did and you didn't see it.

"A. That's right.

---

2. We are unable to find in the record where Judge Bennett said he assumed the signature was that of Judge Stepler.

"Q. You told the grand jury you didn't see any signature at all. You say you did see a signature because you knew it wasn't your signature.

"It says, 'Okay, now, judge, could you see a signature on that when you talked to Mr. Miller?'

"The answer is, 'I don't recall seeing the signature or anything on the report at all.'"

There is no dispute relative to these facts: (1) Judge Stepler's signature was forged. (2) Mr. Rice was concerned relative to the points against his grandson arising from the traffic charge. (3) Rice spoke to Judge Bennett about this concern. (4) Judge Bennett asked Mrs. Weddle, as he put it, "to get [him] information on the status of the Randy Demaris case," which she supplied, and then (5) "in the next day or two, . . . [he] told the status of the case to Pus Rice."

There was evidence before the Commission which, if believed, would have established: This forgery was done by someone with access to Judge Stepler's signature, to the exception forms, and to the data relative to the Demaris case. In light of the testimony of Rice, Judge Bennett was the only person in the District Court office with a motive for changing the District Court record pertaining to Rice's grandson. Judge Bennett when asked if he had done anything for Rice's grandson said he had to get a paper. The janitor did not find the exception report on the floor. Anything he found on the floor he put in the trash can. He never handed Judge Bennett a paper of any kind. Mrs. Weddle found the exception report on her desk. Judge Bennett told her that he found the report on the floor and placed it on her desk. Mrs. Weddle communicated this information to other members of the District Court staff and to Judge Stepler the same day the document appeared. The date as written on the exception report appeared to members of the District Court staff to be in the handwriting of Judge Bennett. Exception reports normally were handwritten but this report was typed. This exception report contains the legend "P.B.J. 641–3 months." Judge Stepler did not use such a disposition legend on her reports.

She was not known to give probation for less than a year. She did not use an entry such as "P.B.J. 641" at all. Judge Bennett did use the abbreviation "P.B.J. 641" and did place motorists appearing before him on probation for periods of less than one year.

In short, we find that the findings of facts of the Commission are supported by clear and convincing evidence. We point out once again that the appendix to this opinion contains the Commission's summary of the evidence before it. We find that summary to be accurate.

### 5. Disposition

The Commission has recommended that Judge Bennett be removed from office. In *In Re Diener and Broccolino*, 268 Md. 659, 304 A.2d 587, the Court said:

"Precisely what 'conduct prejudicial to the proper administration of justice' is or may be, in any or all circumstances, we shall not undertake to say. Indeed, a comprehensive, universally applicable definition may never evolve but it is unlikely we shall ever have much trouble recognizing and identifying such conduct whenever the constituent facts are presented." 268 Md. at 671, 304 A.2d at 594.

Forgery of another judge's name to the change of the disposition in a traffic case in our judgment constitutes "conduct prejudicial to the proper administration of justice." We see no alternative to the entry of an order removing Judge Bennett from office.

ORDER ENTERED THAT JUDGE STANLEY Y. BENNETT BE, AND HE IS, HEREBY REMOVED AS JUDGE OF THE DISTRICT COURT OF MARYLAND.

### APPENDIX: THE OPINION OF THE JUDICIAL DISABILITIES COMMISSION

The Commission held a hearing in the Frederick, Maryland, County Court House from February 21, 1984 through February 24, 1984. During that time the Commission heard testimony from a total of thirty witnesses, 23 of whom were

called on behalf of the Commission, and 7 by the respondent, Judge Bennett.

The clear and convincing evidence before the Commission established that on January 31, 1982, Randy Marion Demaris, the then 16 year old grandson of Marion W. ("Pus") Rice was issued a traffic citation, Maryland Uniform Citation No. 7540135, on a charge of negligent driving. (See Commission Exhibit No. 18.) Mr. Demaris on April 6, 1982, appeared in the District Court, Frederick County, Maryland, where he entered a plea of not guilty. Nevertheless, he was found guilty by Judge Mary Ann Stepler, who imposed a $40.00 fine on Mr. Demaris. The fine was, however, suspended on the condition that Demaris attend a driving instruction program.

At or about the same time, Judge Bennett was engaged in a political contest for the seat on the Circuit Court for Frederick County that had been filled by the appointment of Judge William W. Wenner. Among the political supporters of Judge Bennett was "Pus" Rice, a retired City of Frederick employee, who is and has been active in Democratic politics in Frederick County. Rice testified that he is the Democratic party chairman of the Lewistown district in that county.

From the creditable evidence, the Commission infers that Judge Bennett was importuned by "Pus" Rice to do something on behalf of Rice's grandson Randy Demaris so as to remove the traffic violation from young Demaris' driving record.

Joseph J. Coady, a retired motor vehicle administration employee and a Bennett campaign fund worker, told the Commission that he accompanied Judge Bennett to "Pus" Rice's home on June 16, 1982. While he was there, Rice asked Bennett, "Have you done ... anything for Randy?" According to Coady, Bennett replied, "No, I have got to get a paper." The reason that "Pus" Rice was so interested in what if anything had been done for his grandson relative to the traffic offense was, from what we were told, because

the conviction for the violation precluded Demaris from obtaining a driver's license until he reached age 18. Had the violation been stricken, no obstacle, ostensibly, would have stood in the way of Randy Demaris' receiving a motor vehicle license.

A District Court of Maryland Exception Report, under date of June 17, 1982, bearing the name of Randy Marion Demaris together with the same citation number as that which had been issued to young Demaris (see Commission Exhibit No. 17), was discovered on the desk of Harriett Weddle, a clerk of the District Court. Mrs. Weddle did not appear before the Commission but it was stipulated that had she done so, her testimony would be the same as that she gave in an appearance before the Grand Jury of Frederick County.[1]

Mrs. Weddle told the grand jury that she first saw the "Exception Report" lying on her desk on June 23, 1982. She "looked at it" to see if it was signed. She was not familiar with the case. The Exception Report bore what "looked like" the signature of Judge Mary Ann Stepler. It was dated June 17, 1982.

Everyone agreed that the signature appeared to be that of Judge Stepler, but the State Police, through examination and testing, have convinced the members of the Commission, beyond a doubt, that the signature was a trace forgery. In fact, if the signature on the Exception Report (see Commission Exhibit No. 17.) is compared by superimposing it over the signature on the citation report, Commission Exhibit No. 18, the signatures will appear to be one and the same. There is, however, a minor deviation in the middle initial "A." We were informed that the deviation was likely caused by the slip of a pen or by a depression of some kind

---

1. As an aside, the grand jury conducted a probe in this matter as a result of the active role played therein by the State prosecutor. The grand jury did not, however, return any indictments.

in the object upon which the papers were placed when the signature was traced.[2]

The Exception Report, it is to be noted, contains the legend "P.B.J. 641—3 months." According to Judge Stepler and other witnesses, she did not use the disposition legend shown on the report, that is, "P.B.J. 641—3 months." The testimony established that Judge Stepler was not known to give probation for less than a year, and she did not use the "P.B.J. 641" entry at all. Judge Bennett, on the other hand, did utilize the abbreviation "P.B.J. 641" and did place an errant motorist on probation for periods of less than one year.

Many of the witnesses expressed the view that the date "6–17–82," as written on the Exception Report (Commission Exhibit No. 17), looked as if it were the handwriting of Judge Bennett. Evidence established that Judge Bennett was familiar with the Exception Report procedure.[3]

Initially, Judge Bennett told Mrs. Weddle that "he had found ... [the Exception Report] on the floor and put it on ... [Weddle's] desk." [4] Mrs. Weddle testified before the grand jury that Judge Bennett called her into his office on July 20, 1982. At that time she referred to the Exception Report (Commission Exhibit No. 12) as "the one you [Bennett] found on the floor." The judge replied, "Yes." On August 6, 1982, Judge Bennett told Mrs. Weddle that the Exception Report, "was found on the floor by the janitor but unfortunately the janitor can't remember it."

Significantly, the janitor, Gary Wayne Miller, flatly denied finding the Exception Report on the floor. He said that anything he found on the floor went into the trash can.

---

**2.** Such a tracing is generally made by holding the document over a source of light so that the light shines through the original. It can then be readily traced on the copy.

**3.** The judge admitted that he "used to know how all those things work but I don't clerk anymore." See Commission Exhibit No. 23.

**4.** We attach no significance to the fact that Mrs. Weddle knew "Pus" Rice, inasmuch as he was the brother of her deceased mother-in-law.

Miller stated that he knew Judge Bennett but never had any conversation with him other than a social greeting, and he never handed Judge Bennett a paper of any kind. Miller further testified that he did not know Randy Demaris, did not touch the files in the District Court, and did not dust the office desks unless specifically requested to do so.

While the grand jury inquiry concerning the forgery of Judge Stepler's name on the Exception Report was being conducted, Judge Bennett held an extended telephone conversation with someone in the residence of "Pus" Rice. The telephone call was made from a phone in the court house.

In his appearance before the Commission, Rice, now age 80, denied any wrongdoing. He said that he has been a friend of the Bennetts all of his life and of Judge Bennett all of Judge Bennett's life. Rice testified that he did ask the judge if the latter would make an appointment for "Pus" Rice to see Judge Stepler, but Judge Bennett replied he couldn't make any promises. Rice said he was trying to get rid of the point that Randy had. Rice denied that he received a call from Judge Bennett prior to Rice's appearance before the grand jury.

Randy Demaris' testimony before the Commission and before the grand jury was to the effect that he was not present when and if any conversations took place between Judge Bennett and "Pus" Rice.

Sharply conflicting with the testimony of "Pus" Rice and Randy Demaris was that of Corporal Hoffman of the Maryland State Police who interviewed "Pus" Rice in the latter's home. Cpl. Hoffman testified that on July 19, 1982, Rice told him that Rice had asked Judge Bennett if there was anything Bennett could do about the ticket that Randy Demaris had received. Judge Bennett indicated to Rice that he would talk to Judge Stepler, and later Judge Bennett said that he had spoken to her. At a subsequent interview on July 28, 1982, Rice told Cpl. Hoffman that Rice had first approached Judge Bennett about the traffic ticket while Rice and Judge Bennett were at a benefit in Lewis-

town. At that time Judge Bennett told Rice, "I will speak to her [Stepler]."

When Hoffman interviewed Randy Demaris relative to the June 16, 1982, meeting between Judge Bennett, Rice and Coady, at Rice's house, Demaris told Cpl. Hoffman that he heard Judge Bennett tell Rice that he, Bennett, "had the papers on his desk and he was going to talk to Judge Stepler and get back to him [Rice]."

The testimony of Randy Demaris and "Pus" Rice is remarkably dissimilar to that of Cpl. Hoffman. The Commission, however, believes Cpl. Hoffman and perceives the testimony of Demaris and Rice as incredible.[5]

In his testimony before the Commission, Judge Bennett denied trace forging Judge Stepler's signature to the Exception Report. Judge Bennett told the Commission that when he first saw the Exception Report, the name on the report of the offender, *i.e.* Randy M. Demaris, "didn't mean anything to ... [me]." He did acknowledge, however, that he was asked by Rice to check on the traffic citation that was issued to Demaris. Judge Bennett said that he did check on it and gave the information to Rice.

The judge remembers the matter involving the janitor, and he is certain that the information about the janitor was brought to his attention before he said anything about the janitor. Judge Bennett explained that he suggested to Judge Stepler that the matter not be pursued because he was concerned about the janitor's losing his job, inasmuch as this particular janitor performed his job in a manner superior to his predecessor. The judge was also concerned about how an official investigation might affect his campaign.

It did occur to Judge Bennett that he had seen the janitor sweep up about closing time, and the janitor may have had

---

5. Rice testified that he wanted to talk to the State's attorney about his grandson's case, but when he had that opportunity, he failed to capitalize on it. He was unable to articulate a reason for his failure to do so.

an Exception Report in his hand which the janitor placed on the desk. The report Judge Bennett said "looked like it had a signature on it," but it did not look to him as if it were his signature.

Judge Bennett testified that he did not know what to do with an Exception Report because he did not work with those reports. His statement to the State prosecutor (see Commission Exhibit No. 23) confirms that comment.[6]

There was implication in the defense of Judge Bennett that the forging of the Exception Report was made in an effort to "frame" him so as to cause him to lose, what we infer to be, a bitterly contested judicial election.

### ORDER

For the reasons set forth in the opinion of this Court filed November 26, 1984, it is this 26th day of November, 1984

ORDERED, by the Court of Appeals of Maryland, that, effective November 26, 1984, Judge Stanley Y. Bennett be, and he is hereby, removed as a Judge of the District Court of Maryland, without prejudice to his respective entitlement to whatever pension and other employment benefits accrued to him as of November 26, 1984.