*In the Matter of Judge Devy Patterson Russell*, JD No. 1, September Term, 2018. Opinion by Greene, J.

**JUDGES – REMOVAL OR DISCIPLINE – SANCTION**

Having reviewed the record, the Court of Appeals held that, under the circumstances, the Maryland Commission on Judicial Disabilities' conclusion that the Honorable Devy Patterson Russell committed sanctionable conduct was supported by clear and convincing evidence. From 2007-2015, Judge Russell failed to handle and process search warrant materials in a manner consistent with Maryland Rule 4-601 and internal courthouse procedures. Moreover, Judge Russell instructed a law clerk to destroy the warrant materials. In addition, she repeatedly yelled at court clerks and judges. She subjected court clerks to lineups when clerical mistakes were made, and on one occasion physically pushed a clerk. Judge Russell also repeatedly attempted to undermine the authority of the administrative judge of her court and judges delegated administrative duties.

Her conduct occurred in the courthouse and often in the public view. Furthermore, her conduct had sweeping effects on the courthouse to which she was assigned, fostering an uncomfortable, unprofessional, and tense work environment. Her conduct exhibited a pattern of discourtesy and uncontrollable incivility that had pervasive effects on the administration of justice in the District Court of Maryland located in Baltimore City. As demonstrated herein, a judge may be disciplined if he or she engages in a pattern of inappropriate and discourteous behavior. Here, the appropriate sanction for Judge Russell's misconduct is a consecutive six-month suspension without pay, with her reinstatement conditioned upon her completion of remedial measures set forth by this Court.

Maryland Commission on Judicial Disabilities
Case No. CJD No. 2016-189
Argued: March 4, 2019

IN THE COURT OF APPEALS

OF MARYLAND

JD No. 1

September Term, 2018

_____

IN THE MATTER OF
JUDGE DEVY PATTERSON RUSSELL
JUDGE OF THE DISTRICT COURT
OF MARYLAND LOCATED IN
BALTIMORE CITY, DISTRICT ONE

_____

Greene,
McDonald,
Hotten,
Getty,
Harrell, Glenn T., Jr.,
　　　(Senior Judge, Specially Assigned),
Eyler, Deborah S.,
　　　(Senior Judge, Specially Assigned),
Thieme, Raymond G., Jr.,
　　　(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: June 28, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Maryland Judiciary serves the public by endeavoring to preserve the principles of justice. In furtherance of the judiciary's task and role in society, it is critical that Maryland judges uphold the dignity of the office and aspire to maintain public confidence in the judiciary. As such, judges, at all times, are expected to conform their conduct to ethical standards, which are codified in the Maryland Code of Judicial Conduct. When a judge's conduct falls short of that which is expected by the Rules, the judge may be subject to disciplinary proceedings and sanctions. Maryland Rule 18-401(k)(1). The Maryland Constitution vests the duty of investigating and recommending disposition of instances involving alleged judicial misconduct in the Commission on Judicial Disabilities ("Commission"). *See generally*, Md. Const. Art. IV, §§ 4A, 4B. The Commission is empowered to investigate judicial misconduct and, in certain instances, directly discipline judges. Md. Const. Art. IV, § 4B. In the most serious instances, it is this Court's duty to take action. *See id*.

In the present case, the Commission found that Respondent, the Honorable Devy Patterson Russell ("Judge Russell" or "Respondent"), engaged in misconduct. The Commission explained that from 2007-2015, Judge Russell abdicated her duty to handle and process search warrant materials, as required by Maryland Rule 4-601 and internal courthouse policies. Furthermore, Respondent failed to treat fellow judges and courthouse staff with dignity and respect, and her misbehavior created an uncomfortable and unprofessional work environment. The Commission recommended that Judge Russell be suspended for six months without pay and that she take remedial measures to assist her when she returns to her duties. The Commission referred the matter to this Court. *See* Md.

Const. Art. IV, § 4B(b); *see also* Md. Rule 18-407(j). As such, we are called upon to review whether Respondent committed sanctionable conduct and decide the appropriate sanction, if any. *See* Md. Const. Art. IV, § 4B(b).

## I. BACKGROUND

At all relevant times, Judge Russell was an Associate Judge of the District Court of Maryland, sitting in Baltimore City, District One.[1] She was appointed to the District Court in February 2006 and confirmed to serve an initial 10-year term. In February 2016, Judge Russell was reappointed and again confirmed to sit on the District Court for a second term of 10 years.

On January 16, 2018, Investigative Counsel, at the directive of the Commission on Judicial Disabilities, filed charges against Judge Russell pursuant to Md. Rule 18-407(a).[2] The charges followed the Commission's review of an investigation that was conducted by Investigative Counsel, which yielded probable cause for the Commission to believe that

---

[1] The State of Maryland has one statewide District Court that is divided into 12 districts. Md. Code Ann., Courts and Judicial Proceedings, § 1-602. The District Court is composed of associate judges, who hold court in the 12 districts. *Id*. at § 1-603. There is one Chief Judge for the District Court, who is the administrative head of the court. *Id*. at § 1-605. In each branch of the District Court, the Chief Judge must designate administrative judges who are "responsible for the administration, operation, and maintenance" of their particular geographical jurisdiction. *Id*. at § 1-607.

Hereinafter, references to the "District Court" mean the District Court located in Baltimore City, unless specified otherwise.

[2] In this Opinion, we utilize the Maryland Rules of Judicial Conduct that were in place at the time of Respondent's proceeding. The Rules were amended, effective July 1, 2019, but the modified Rules are not relevant to the present case. 2019 Md. Court Order 0001.

Judge Russell committed sanctionable conduct, as defined by Md. Rule 18-401(k).[3] Judge Russell filed a "Response to Commission's Charges" on March 14, 2018, consistent with Md. Rule 18-407(c). Therein, she denied the charges, raised objections to the investigation procedure and factual predicates, and requested a hearing.

Thereafter, in accord with Md. Rule 18-407, the Commission held a public hearing on the charges on October 15-19 and November 5, 2018. At the hearing, Judge Russell appeared with counsel and the Commission was represented by Investigative Counsel. In total, the Commission received 50 exhibits from Investigative Counsel and 17 exhibits from Judge Russell; heard testimony from 21 witnesses called by Investigative Counsel and 14 witnesses called by Judge Russell; reviewed Judge Russell's prior record with the Commission; and considered more than four dozen letters supporting Judge Russell.

On December 6, 2018 the Commission filed "Amended Findings of Fact, Conclusions of Law, Order and Recommendations" pursuant to Md. Rule 18-407(k)(1).[4]

---

[3] Sanctionable conduct is defined as "misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct prejudicial to the proper administration of justice. A judge's violation of any of the provisions of the Maryland Code of Judicial Conduct promulgated by Title 18, Chapter 100 may constitute sanctionable conduct." Md. Rule 18-401(k)(1). Here, Judge Russell was charged with violating several provisions of the Code of Judicial Conduct. Specifically, the Commission charged Judge Russell with violating Md. Rules 18-101.1 (Compliance with the Law), 18-101.2 (Promoting Confidence in the Judiciary), 18-102.1 (Giving Precedence to the Duties of Judicial Office), 18-102.3 (Bias, Prejudice, and Harassment), 18-102.5 (Competence, Diligence, and Cooperation), 18-102.8 (Decorum, Demeanor, and Communication with Jurors), 18-102.12 (Supervisory Duties), and 18-102.16 (Cooperation with Disciplinary Authorities).

[4] On November 30, 2018, the Commission rendered its initial "Findings of Fact, Conclusions of Law, Order and Recommendations."

3

The Commission found that, from 2007-2015, Judge Russell failed to handle and process search warrant materials in a manner consistent with Md. Rule 4-601 and internal District Court procedures. According to the Commission findings, Judge Russell instructed a law clerk to destroy the warrant materials. In addition, the Commission found that when clerical errors were made, Judge Russell yelled at court clerks, subjected them to lineups, and on one occasion physically pushed a clerk. Furthermore, Judge Russell repeatedly yelled at fellow judges and attempted to undermine the authority of judges delegated administrative duties. Her conduct occurred in public and in private, and it fostered an uncomfortable and tense work environment in the courthouse to which Judge Russell was assigned.

The Commission unanimously found clear and convincing evidence that Judge Russell's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-101.2 (Promoting Confidence in the Judiciary), 18-102.5 (Competence, Diligence, and Cooperation), 18-102.8 (Decorum, Demeanor, and Communication with Jurors), and 18-102.12 (Supervisory Duties).[5] Having concluded that Judge Russell committed sanctionable conduct, the Commission recommended her immediate suspension for a period of six months without pay. In addition, the Commission recommended that Judge Russell be required to undertake remedial measures to assist her as she returns to her duties. The Commission ordered that the matter be referred to this Court for review, in accordance

---

[5] Although Respondent was charged with violating Md. Rules 18-102.1 (Giving Precedence to the Duties of Judicial Office), 18-102.3 (Bias, Prejudice, and Harassment), and 18-102.16 (Cooperation with Disciplinary Authorities), the Commission dismissed those charges for lack of proof.

4

with Md. Rule 18-407(j).

On December 31, 2018, Judge Russell filed "Exceptions by Judge Russell to Amended Findings of Fact, Conclusions of Law, Order and Recommendation" with this Court. *See* Md. Rule 18-408(b) (Exceptions). The Commission responded to Judge Russell's Exceptions on January 16, 2019 in a "Response to Exceptions by Judge Russell to Amended Findings of Fact, Conclusions of Law, Order and Recommendation." *See* Md. Rule 18-408(c) (Response). A hearing was conducted before this Court on March 4, 2019. *See* Md. Rule 18-408(d) (Hearing). In this opinion, we review which, if any, Maryland Rules Respondent violated. *See* Md. Rule 18-408(e) (Disposition); *see also* Md. Rule 18-408(f) (Decision). Upon our determination of the existence of sanctionable conduct, we impose the appropriate sanction. *See* Md. Rule 18-408(e) (Disposition).

## II. ALLEGED LEGAL ERRORS

As a preliminary matter, Respondent raises several legal challenges to the Commission's disposition of her case. Respondent alleges that the Commission erred when it denied her Motion to Recuse and Motion to Suppress. Furthermore, Respondent claims that a host of legal doctrines support dismissing the charges against her. Finally, Respondent argues that several procedural defects occurred, which require that the charges be dismissed. We review each allegation in turn.

### 1. Motion to Recuse

On August 31, 2018, Respondent filed a "Motion to Recuse." Therein, Respondent requested that the Honorable Susan H. Hazlett ("Judge Hazlett"), who is the Commission's Vice Chair and the Administrative Judge for the District Court of Maryland, sitting in

5

Harford County, recuse herself from Respondent's proceedings. On September 10, 2018, the Commission filed an Order and a supporting memorandum denying Respondent's Motion. The Commission explained that it lacked information concerning any occurrence involving Respondent with which Judge Hazlett was personally familiar. In addition, the Commission explained that Judge Hazlett was not predisposed to find any witness credible. Finally, the Commission determined that, even if Judge Hazlett's recusal was warranted, the rule of necessity overrides the rule of recusal. Accordingly, Judge Hazlett participated in the disposition of Respondent's case.

Before this Court, Respondent argues that the Commission erred by denying her Motion to Recuse. She emphasizes that the Honorable John P. Morrissey ("Chief Judge Morrissey"), Chief Judge of the District Court of Maryland, testified at the Commission hearing. Respondent argues that Chief Judge Morrissey is Judge Hazlett's boss, so Judge Hazlett's impartiality could reasonably be questioned. The Commission maintains that the Motion was properly denied because Judge Hazlett's impartiality was not compromised, and the rule of necessity required her participation in any event.

*Discussion*

In the conduct of Commission business, the Commission's members are bound by the rule of recusal. Md. Rule 18-402(b). Commission members must recuse themselves when, *inter alia*, "the recusal of a judicial member would otherwise be required by the Maryland Code of Judicial Conduct." *Id.* Generally speaking, a judge is required to recuse himself or herself from a proceeding when a reasonable person with knowledge and understanding of all the relevant facts would question the judge's impartiality. *Jefferson-*

6

*El v. State*, 330 Md. 99, 106-07, 622 A.2d 737, 741 (1993) (citations omitted). We review a judge's decision to recuse or not to recuse under an abuse of discretion standard. *Id*. at 107, 622 A.2d at 741. "[T]here is a strong presumption in Maryland . . . that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." *Id*.

For example, in *In re Turney*, we held that a judge should have recused himself from a hearing. 311 Md. 246, 246-47, 533 A.2d 916, 916-17 (1987). There, Frederick Leary was issued a citation and charged with possession of a fake license. *Id*. at 247, 533 A.2d at 917. Mr. Leary obtained the fake license from the son of the Honorable Jack R. Turney, a judge of the District Court of Maryland, sitting in Garrett County. *Id*. Mr. Leary was Judge Turney's ex-wife's stepson and a close friend of Judge Turney's son. *Id*. Mr. Leary's case came before the District Court, and Judge Turney presided over the hearing. *Id*. at 248, 533 A.2d at 917-18. During the hearing, Judge Turney made efforts to prevent Mr. Leary from disclosing who he obtained the fake license from, and ultimately accepted Mr. Leary's guilty plea and imposed a fine. *Id*. at 248-50, 533 A.2d at 918-19. Judge Turney was sanctioned for his conduct. *Id*. at 257-58, 533 A.2d at 922.

Here, Respondent's Motion to Recuse was properly denied. Judge Hazlett had no demonstrable personal ties to Respondent or the outcome of Respondent's proceeding that would influence her review of the evidence. As Respondent points out, Judge Hazlett and Chief Judge Morrissey both preside narrowly or broadly, respectively, over the District Court of Maryland. There is no allegation that they have a particularly close friendship. Given that Judge Hazlett is the Administrative Judge for the District Court of Maryland,

7

sitting in Harford County, Chief Judge Morrissey is, perhaps in a colloquial sense, her boss.[6]  As Chief Judge of the District Court, Chief Judge Morrissey is the administrative head of the District Court.  He is entrusted with overseeing "the maintenance, administration, and operation of the [district] court in all its locations throughout the State." Md. Code Ann., Cts. & Jud. Proc., § 1-605(a); Md. Rule 16-106(a).  In that capacity, however, he does not have authority over Judge Hazlett's independent decision making – in this or any other case.  *See id.*  As such, there is no indication that Judge Hazlett formed an opinion in this case, or was otherwise influenced by, her professional affiliation with Chief Judge Morrissey.[7]

Furthermore, as one of three members of the judiciary serving on the Commission, our Constitution tasks Judge Hazlett, in collaboration with the Commission's other judicial members, with reviewing the conduct of and, if appropriate, sanctioning her fellow judges. Md. Const. Art. IV, § 4B.  By the very nature of her position as an Administrative Judge or Vice Chair of the Commission, Judge Hazlett may be required to assess the performance

---

[6] The powers and duties of the Chief Judge of the District Court of Maryland are set forth in Md. Code Ann., Cts. & Jud. Proc., § 1-605.  For example, he or she is permitted to make administrative regulations for the District Court and temporarily assign a District Court judge to sit in a different county.  *Id.*

[7] Respondent's allegation that Judge Hazlett was acquainted with other judges who testified as witnesses, and judges who she thought would testify at the hearing but did not testify, is equally unavailing.  Furthermore, Respondent has not alleged a factual basis to support her allegation that Judge Hazlett had personal knowledge of facts in dispute.  As the Commission found, Respondent has not indicated facts concerning any occurrence involving Respondent with which Judge Hazlett was familiar.  Likewise, Respondent asserts no such facts before this Court.  Therefore, the Commission properly denied Respondent's Motion to Recuse.

of individuals with whom she is professionally acquainted. Indeed, that is her duty. In accordance with her duties, Judge Hazlett was one of seven Commission members who participated in the unanimous decision and recommendation in the present case. Under these circumstances, a reasonable person would not doubt Judge Hazlett's independent and impartial judgment. Accordingly, Respondent's Motion to Recuse Judge Hazlett was properly denied.[8]

## 2. Motion to Suppress

A considerable portion of the hearing before the Commission concerned Respondent's handling of search warrants. The circumstances regarding the search warrant issues are more thoroughly explored later in this opinion. For now, we simply note that Respondent stored search warrant materials in boxes. The boxes were removed from the courthouse at the direction of the Honorable Barbara Waxman ("Judge Waxman"), Administrative Judge[9] of the District Court, and delivered to Investigative Counsel on December 21, 2016. On September 13, 2018, Respondent filed a Motion to Suppress. Respondent argued that the boxes of warrants were taken in violation of the Fourth and

---

[8] As required by the Maryland Constitution, there were three judicial members of the Commission – Judge Hazlett, the Honorable Michael W. Reed ("Judge Reed"), Associate Judge of the Court of Special Appeals, and the Honorable Robert B. Kershaw ("Judge Kershaw"), Associate Judge of the Circuit Court for Baltimore City. Md. Const. Art. IV, § 4A. Judge Reed and Judge Kershaw recused themselves from Respondent's proceeding. Nonetheless, because we conclude that Judge Hazlett was not required to recuse herself, we need not decide whether the rule of necessity required Judge Hazlett's participation as the only remaining judicial member in this case. *See* Md. Rule 18-102.11, Cmt. 3.

[9] Administrative judges of the District Court are "responsible for the administration, operation, and maintenance of the District Court" in the district in which he or she sits and "for the conduct of the District Court's business." Md. Code, Cts. & Jud. Proc, § 1-607.

Fourteenth Amendments to the United States Constitution, Articles 22 and 24 of the Maryland Declaration of Rights, and Maryland Rule 4-601. On September 14, 2018, the Commission denied Respondent's Motion to Suppress, concluding that the exclusionary rule does not apply to proceedings before the Commission. At Respondent's hearing before the Commission, the warrants were admitted into evidence. Respondent now contends that her Motion to Suppress was improperly denied.

*Discussion*

The Fourth Amendment to the United States Constitution and its Maryland counterpart protects citizens from unreasonable searches and seizures. *Wilkes v. State*, 364 Md. 554, 570-71, 774 A.2d 420, 430 (2001). For the Fourth Amendment to apply, an individual must demonstrate that a government actor infringed upon his or her "actual, subjective expectation of privacy in [an] item or place searched" and that "the expectation [of privacy] is one that society is prepared to recognize as reasonable." *Walker v. State*, 432 Md. 587, 605, 69 A.3d 1066, 1077 (2013) (citation omitted).

In *Walker v. State*, this Court explained that public employees may have privacy expectations in their work spaces. *Id.* at 608, 69 A.3d at 1079. Such expectations, however, may be curtailed "by virtue of actual office practices and procedures[.]" *Id.* There, we concluded that a teacher lacked a privacy interest in his desk at the elementary school where he worked. *Id.* at 612-13, 69 A.3d at 1081-82. The teacher's desk was in an open room with a high volume of traffic. *Id.* at 612, 69 A.3d at 1081. It had labels on its drawers indicating that work items, not personal items, were stored within it, and the teacher "fail[ed] to lock the desk when given the option to do so[.]" *Id.*

10

Here, according to Judge Waxman, Respondent's search warrant materials were discovered in a courthouse where Respondent had not worked for approximately two months. The boxes were labeled "Russell" and "Civil," and they were found in an unsecure location. Judge Waxman explained, and neither party disputes, that "[t]he boxes were found in the law clerks' office . . . not in a judge's chambers." The office was "the judges' clerks' office where there's a little portion of the clerks' office that's been set aside for the law clerks, but it's all one big area." In that location, the boxes were accessible by individuals working inside and outside of the judiciary. In sum, Respondent stored her boxes of warrants unsecure and in a high-traffic area that was outside of her personal workspace and immediate attention. As a result, Respondent cannot claim a reasonable expectation of privacy in the boxes, as is necessary to prevail on her Motion to Suppress. Therefore, we conclude that Respondent's Motion to Suppress was properly denied pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, Articles 22 and 24 of the Maryland Declaration of Rights, and Md. Rule 4-601.[10]

---

[10] Even if Respondent had a legitimate privacy interest in her boxes, it is questionable as to whether the exclusionary rule applies to proceedings before the Commission. Where evidence is obtained in violation of an individual's Fourth Amendment rights, the exclusionary rule provides that the evidence will be inadmissible at trial. *United States v. Janis*, 428 U.S. 433, 445-46, 96 S.Ct. 3021, 3028, 49 L.Ed.2d. 1046 (1976). "As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id*. at 447, 96 S.Ct. at 3028 (citations omitted); *see Motor Vehicle Admin. v. Richards*, 356 Md. 356, 373, 739 A.2d 58, 68 (1999) (holding that the exclusionary rule does not apply to administrative license suspension proceedings, which serve "to protect the public from unscrupulous or unskilled operators who would otherwise engage in the licensed activity."). Proceedings before the Commission are neither civil nor criminal, and they do not fall within the ambit of the Administrative Procedure Act. *In re Diener and Broccolino*, 268 Md. 659, 670, 304 A.2d (continued . . .)

**3. Limitations, Laches, Res Judicata, Estoppel, Separation of Powers (Constitutional Reappointment), and Fundamental Fairness**

Respondent contends that allegations of her misconduct were not brought to the attention of Maryland Governor Lawrence J. Hogan, Jr. ("Governor Hogan") or the Maryland Senate in February 2016 when she was reappointed and confirmed for her second term as a judge. Respondent notes that many of the Commission's Findings of Fact and Conclusions of Law are predicated on events that took place before February 2016, and were known by and discussed with Respondent's colleagues and supervisors. Respondent explains that "[i]t is difficult to articulate a concise neat legal theory for the legal objections in this section[,]" but she maintains that it is unfair for her to be disciplined for conduct that occurred prior to her 2016 reappointment. Accordingly, Respondent invites us to dismiss the charges brought against her.[11] The Commission contends that Respondent's

---

(. . . continued)
587, 594 (1973). "[T]hey are merely an inquiry into the conduct of a judicial officer[,] the aim of which is the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual." *Id*.

[11] Respondent posits that any one of the doctrines of limitations, laches, constitutional separation of powers, res judicata, estoppel, or fundamental fairness may warrant dismissal. By way of background, "a statute of limitations represents . . . a policy decision regarding what constitutes an adequate period of time for a person of ordinary diligence to pursue his claim." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 84, 904 A.2d 511, 526 (2006). The limitations period constitutes the quantity of time that a plaintiff has to bring an action against another before he or she is deemed to have waived the right to sue and acquiesced to the defendant's alleged wrongdoing. *Id*. at 84-85, 904 A.2d at 526. Laches is a different but related doctrine. *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 603, 92 A.3d 400, 491 (2014). Laches "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *Id*. at 586, 438 A.3d at 480 (citations omitted). Unlike limitations, laches is an equitable (continued . . .)

position is unsubstantiated, and that a judge may be sanctioned for his or her conduct so

long as the judge remains in office.

---

(. . . continued)

doctrine which must be evaluated on a case by case basis. *Schaeffer v. Anne Arundel County*, 338 Md. 75, 83, 656 A.2d 751, 755 (1995).

Separation of powers is a constitutionally created doctrine, "integral to our tripartite system of government." *Meyer v. State*, 445 Md. 648, 672, 128 A.3d 147, 161 (2015). Article 8 of the Maryland Declaration of Rights provides "[t]hat the Legislative, Executive, and Judicial powers of government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." *Id*. at 672 n. 14, 128 A.3d at 161 n. 14. Though we have applied the doctrine with a "sensible degree of elasticity," it ensures that the three branches of our State government possess equal and independent power to exercise the functions committed to them. *See generally id*. at 671-75, 128 A.3d at 160-63.

The doctrine of res judicata is otherwise known as claim preclusion. *Anne Arundel County Bd. of Educ. v. Norville*, 390 Md. 93, 106, 887 A.2d 1029, 1036 (2005). It prohibits relitigating a claim if a final judgment was obtained in previous litigation, and "the parties, the subject matter and [the] causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation." *Id*. at 106-07, 887 A.2d at 1037.

Equitable estoppel provides a defense to an individual who, in reliance on another's voluntary conduct or representation, changed his or her position for the worse. *Creveling v. Government Employees Ins. Co.*, 376 Md. 72, 101-02, 828 A.2d 229, 246 (2003). Under such circumstances, the party who relied on the representation may preclude the estopped party "at law and in equity, from asserting rights which might perhaps have otherwise existed[.]" *Id*. (citations omitted).

Fundamental fairness is a broad concept with precepts extending to every proceeding before a tribunal. In the present case, we understand Respondent's assertion to be that an error was committed that was so prejudicial to her that the charges against her cannot stand. *See Diggs v. State*, 409 Md. 260, 286, 973 A.2d 796, 811 (2009) (Under plain error analysis, reversal may be warranted if an error caused prejudice that is so "compelling, extraordinary, exceptional or fundamental" to the right to a fair trial) (internal quotations and citations omitted).

13

*Discussion*

We are unpersuaded that the host of legal theories that Respondent asserts warrant dismissing the charges against her. The Maryland Rules do not set forth a statute of limitations for when the Commission must commence disciplinary proceedings against a judge. Rather, the Rules afford the Commission broad discretion to discipline "sanctionable conduct," defined as "misconduct while in office, the persistent failure by a judge to perform the duties of the judge's office, or conduct prejudicial to the proper administration of justice." Md. Rule 18-401(k)(1). In addition, the allegations of judicial misconduct brought against Respondent have not been the subject of a prior action before any tribunal which resulted in a final judgment.

Furthermore, we cannot fathom, and Respondent does not articulate, how it is prejudicial or unfair to Respondent for the Commission to hold her accountable for conduct that she committed while serving as a judge, albeit before her reappointment in 2016. Given that Respondent is serving as a Maryland judge, she is subject to the authority of the Commission and this Court for disciplinary matters. *See* Md. Rule 18-407 (affording the Commission discretion to review and discipline "sanctionable conduct," as defined in Md. Rule 18-401(k)). Moreover, the Commission was not presented with an isolated instance of Respondent's conduct that occurred before 2016. The Commission reviewed instances of conduct that reflect a larger pattern of uncooperative and unseemly behavior. Absent any discernible prejudice to Respondent, to limit the Commission's authority to act on judicial misconduct based off of what the Governor and the General Assembly may or may not have known at the time of Respondent's reappointment would be speculative, arbitrary,

14

and repulsive to the administration of justice. Therefore, we decline to dismiss the charges against Respondent based upon limitations, laches, res judicata, estoppel, constitutional separation of powers, or fundamental fairness.

### 4. Motion to Dismiss

Finally, Respondent filed a number of pleadings in this case, raising alleged procedural defects. On March 14, 2018, Respondent filed a "Response to the Commission's Charges" that asserted procedural defects. In addition, Respondent filed a Petition for a Writ of Mandamus with this Court on March 14, 2018, which we denied on March 22, 2018. Finally, on October 12, 2018, Respondent filed a Motion to Dismiss with the Commission. The Commission denied the Motion to Dismiss on November 7, 2018.

Before this Court, Respondent maintains that procedural defects occurred before charges were brought against her. Specifically, she contends that the procedural requirements in Md. Rules 18-404 and 18-405 were not followed to her detriment. Respondent claims that she was not given a reasonable opportunity to present information to the Judicial Inquiry Board[12] ("Board") or object to the Board's report and recommendation. Finally, Respondent claims that she was not given notice of her "disrespectful, combative, and unprofessional interactions with fellow judges and other courthouse staff" before the charges were filed. The Commission insists that Respondent's allegations are unfounded.

---

[12] The Judicial Inquiry Board is a body separate from the Commission. *See* Md. Rule 18-403(a). Its members consist of two judges, two attorneys, and three members of the public who are not attorneys or judges, all of whom are appointed by the Commission. *Id*.

15

*Discussion*

Respondent was afforded and utilized the procedural mechanisms available to her under the Rules. Investigative Counsel issued her report to the Judicial Inquiry Board on September 25, 2017. Included within that report were 13 responses from Respondent, thus indicating that Respondent was permitted to supply information with regard to the investigation before it concluded. *See* Md. Rule 18-404(e)(5). Less than 45 days later, on October 16, 2017, the Board sent the Commission its report and recommendation. *See* Md. Rule 18-404(j)(3). The Board recommended that the Commission find probable cause to believe that Respondent committed sanctionable conduct. To reach its disposition, the Board reviewed the 13 items submitted by Respondent, in addition to exhibits, statements, and other items that were submitted by Investigative Counsel. On October 26, 2017, the Board released its report to Respondent and Investigative Counsel. Thereafter, Respondent requested and was granted an extension of time to respond to the Board's report. On December 7, 2017, Respondent filed objections to the report, challenging the Board's recommendation.

We fail to see how the procedural requirements for the preliminary investigation and Board review under Md. Rules 18-404 and 18-504 were violated. Under the unambiguous language of Md. Rule 18-404(e), Respondent was not, as she contends, entitled to present information to the Judicial Inquiry Board. Md. Rule 18-404(e) does not apply to the Board. It provides that "Investigative Counsel shall afford the judge a reasonable opportunity to present, in person or in writing, such information as the judge chooses" during the preliminary investigation. Md. Rule 18-404(e)(5). The record

16

indicates that Respondent presented 13 items to Investigative Counsel. Furthermore, contrary to Respondent's contention, she was permitted to and did in fact object to the Board's report and recommendations. She was even extended extra time to do so.

Finally, the Rules do not require the Commission or this Court to dismiss an action when procedural requirements are not met with strict compliance. At best, when certain time requirements regarding the preliminary investigation into the conduct of a judge are not met, the Commission *may* – but is not required to – terminate the proceeding. Md. Rule 18-404(e)(6). Respondent was given ample notice of the charges brought against her, and a full and fair opportunity to defend herself against them. Accordingly, the charges brought against Respondent should not be dismissed based on the alleged procedural defects.

## III. RESPONDENT'S EXCEPTIONS TO THE COMMISSION'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

We now direct our attention to Respondent's Exceptions to the Commission's Findings of Fact and Conclusions of Law. The Commission issued findings of fact and conclusions of law, in which it found by clear and convincing evidence that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-101.2 (Promoting Confidence in the Judiciary), 18-102.5 (Competence, Diligence, and Cooperation), 18-102.8 (Decorum, Demeanor, and Communication with Jurors), and 18-102.12 (Supervisory Duties), and that her violations amounted to sanctionable conduct.[13]

---

[13] Md. Rule 18-101.1. Compliance with the Law
        A judge shall comply with the law, including this Code of Judicial Conduct.
(continued . . .)

"Upon our independent review, this Court must determine whether the charges against the [R]espondent are supported by clear and convincing evidence and which, if any, [Rules] have been violated." *In re Lamdin*, 404 Md. 631, 637, 948 A.2d 54, 57 (2008) (citing *In re Diener and Broccolino*, 268 Md. 659, 670, 304 A.2d 587, 594 (1973)). "[A]lthough the [Commission's] report is only advisory, [we] should give full consideration to it, particularly with respect to the credibility of witnesses, where the testimony is conflicting." *See In re Bennett*, 301 Md. 517, 530, 483 A.2d 1242, 1248 (1984) (quoting *Bar Ass'n v. Marshall*, 269 Md. 510, 307 A.2d 677 (1973)). Accordingly, the Commission's "findings of fact from the evidence are prima facie correct and they will

---

(. . . continued)

Md. Rule 18-101.2. Promoting Confidence in the Judiciary
    (a) A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary.

Md. Rule 18-102.5. Competence, Diligence, and Cooperation
    (a) A judge shall perform judicial and administrative duties competently, diligently, promptly, and without favoritism or nepotism.
    (b) A judge shall cooperate with other judges and court officials in the administration of court business.
    (c) A judge shall not willfully fail to comply with administrative rules or reasonable directives of a judge with supervisory authority.

Md. Rule 18-102.8. Decorum, Demeanor, and Communication with Jurors
    (b) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, attorneys, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of attorneys, court staff, court officials, and others subject to the judge's direction and control.

Md. Rule 18-102.12. Supervisory Duties
    (a) A judge shall require court staff, court officials, and others subject to the judge's direction and control to act in a manner consistent with the judge's obligations under this Code.

18

not be disturbed unless determined to be clearly erroneous." *Id*. If this Court concludes that sanctionable conduct has occurred, we "must then determine what discipline, if any, is appropriate under the circumstances." *Lamdin*, 404 Md. at 637, 948 A.2d at 57. Our decision "shall be evidenced by an Order of the Court, certified under seal and shall be accompanied by a written opinion." *Id*. (citation omitted); *see* Md. Rule 18-408(f).

In her Exceptions, Respondent objected to nearly all of the Commission's findings of fact and conclusions of law. For purposes of organization, we have divided the Commission's findings of fact and conclusions of law, and Respondent's objections thereto, into two categories: (1) Search Warrant Issues; and (2) Interpersonal Issues. We review each category in turn.

## 1. Search Warrant Issues

By way of background, the Maryland Rules set forth procedures for judges to follow when, *inter alia*, granting search warrants, handling search warrant materials, and processing search warrant materials. *See generally* Md. Rule 4-601. When a judge issues a search warrant, he or she must sign it and deliver the warrant and a copy of the application and its supporting affidavit to the applicant. Md. Rule 4-601(c). In addition, the judge must retain a copy of the application, affidavit, and warrant. Md. Rule 4-601(d)(2). Additionally, "[a] search warrant shall be issued with all practicable secrecy." Md. Rule 4-601(d)(1).

Thereafter, the warrant may or may not be executed. If the warrant is executed, the

19

executing officer must prepare a search warrant return[14] and deliver the warrant, warrant return, and a verified list of inventory that was seized to, preferably, the judge who issued the warrant. Md. Rule 4-601(f). Then, according to testimony on the record, a judge who receives warrant materials from an officer will generally have the officer affirm the property that was recovered, and the judge will sign the warrant return. Subsequently, the judge must compile the warrant, warrant return, verified inventory, "and all other papers in connection with the issuance, execution, and return, including the copies retained by the issuing judge, and shall file them with the clerk of the court for the county from which the warrant was issued." Md. Rule 4-601(g). If the warrant is not executed, the executing officer must return the warrant to the issuing judge who, upon receiving the unexecuted warrant, "may destroy the warrant and related papers or make any other disposition the judge deems proper." Md. Rule 4-601(h)(2).

*The Commission's Findings of Fact and Conclusions of Law*

The Commission found that over the course of several years, Respondent failed to process her search warrants in a timely manner. Specifically, Respondent failed to keep the warrants in her possession confidential and secure pending possible return and processing. Additionally, Respondent did not promptly match warrants with warrant returns and transmit them to the clerk for filing. Based on testimony at the hearing, the Commission found that Respondent had boxes containing at least 135 warrants that should have been, but were not, matched with a return and sent to the clerk for filing. "By the

---

[14] A search warrant return is a document that specifies the date and time that a warrant was executed and an inventory of property that was seized. Md. Rule 4-601(f).

Commission's own count, however, there were [23] more warrants that were either processable or potentially processable." The Commission concluded that Respondent's failure to process search warrants in a timely manner and related conduct violated Md. Rules 4-601(g), 18-101.1 (Compliance with the Law), and 18-102.5(a) (performing judicial and administrative duties competently, diligently, and promptly).

The Commission found that in 2016, Respondent tasked Ama Asare, a law clerk, with taking boxes in which Respondent accumulated warrant-related materials and matching warrants with warrant returns. The Commission found that Respondent ultimately told Ms. Asare, "Just get rid of them," referring to the search warrants that she was tasked with matching up. The Commission concluded that Respondent's direction to Ms. Asare violated Md. Rules 18-101.1 (Compliance with the Code of Judicial Conduct) and 18-102.12(a) (Supervisory Duties).

The Commission also found that Respondent violated existing internal policies, followed by judges serving on the District Court, relating to search warrants. One of the policies was implemented by Administrative Judge Waxman and "direct[ed] District Court judges not to review and sign warrants while sitting at the Civil Courthouse except under exigent circumstances." The Commission found that Respondent continued to review and sign search warrants while assigned to work at the Civil Courthouse. Respondent admitted to her conduct when she testified, and two of her witnesses confirmed her testimony.

Additionally, the Commission found that the District Court had a policy that prohibited a judge from signing a search warrant return for another judge unless the two judges were assigned to the same court location. The policy served to ensure that search

21

warrants were handled confidentially and securely, as search warrants contain sensitive information and may be evidence. The Commission found that "[i]n November 2017, [R]espondent signed a search warrant for Judge Joan Bossman Gordon while Judge Gordon was assigned to a different court location." Moreover, "[t]he return was transmitted to Judge Gordon through interoffice mail, also violating the policy." The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law, including the Code of Judicial Conduct), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.5(c) (Compliance with administrative rules or reasonable directives of supervisors).

*Respondent's Exceptions to the Commission's Findings of Fact and Conclusions of Law*

Respondent denies violating Md. Rule 4-601. She contends that she properly processed and securely maintained her search warrant materials. Respondent explains that, since becoming a judge, she has never destroyed any of her search warrant materials, but she treated her "non-processable" and "processable" warrants differently. She opted to keep "non-processable" warrants, even though Md. Rule 4-601 permitted her to destroy them. The "non-processable" warrants were the documents that she kept in boxes, which she referred to as her "nomad boxes." By contrast, Respondent maintains that for warrants that she deemed "processable" she would, immediately or periodically, match up the various documents and file them. With these methods in practice, when she transferred to a different courthouse, she would not have to carry her "processable" warrants with her. She would simply carry her nomad boxes, containing her accumulation of warrants that she deemed "non-processable."

22

Ultimately, Respondent's nomad boxes were collected by Judge Waxman, the Administrative Judge, and the Honorable Mark F. Scurti ("Judge Scurti"), the Judge in Charge[15] of the Civil Docket for the District Court. Judge Waxman examined and collated the documents in the nomad boxes, and she discovered 135 warrants that should have been filed with the clerk's office. According to Respondent, however, the documents that Judge Waxman found were "non-processable" warrants because there was no "judicial" copy of them.

In addition, Respondent argues that the Commission misunderstood the scenario involving Ms. Asare. Respondent explains that in September 2016, she was transferred to a new courthouse, so she emptied a drawer that had accumulated search warrants. She assigned Ms. Asare the task of matching up the warrants with warrant returns. Then, she instructed Ms. Asare to "get rid" of warrants that Ms. Asare could not match up, which Respondent alleges was permitted by the Rules. According to Respondent, however, the warrants "would not be 'gotten rid of[,]' they would be kept in the nomad boxes." She argues that Ms. Asare, a "brand-new inexperienced law clerk[,]" misinterpreted her instructions.

Lastly, Respondent argues that the Commission misstated the policy change implemented by Judge Waxman. Furthermore, Respondent posits that her handling of

---

[15] Judge Scurti testified that each building that represents part of the District Court has a judge in charge. The judge in charge "is responsible for scheduling, building issues, any problems that arise by the clerks, just primarily handling any issues that c[ome] up day to day at the courthouse." In addition, the judge in charge "can recommend changes in policies and procedure and implement them . . . with [the] administrative judge's approval," and ensures that existing policies and procedures are carried out.

Judge Gordon's warrant return, albeit improper, did not cause any harm. Accordingly, Respondent asserts that her conduct was not sanctionable.

*Discussion*

We agree with Respondent that, as to the Commission's factual finding regarding Judge Waxman's internal search warrant policy, the Commission's conclusion that Respondent violated the policy is not supported by the record. Judge Waxman's testimony indicates that her policy initiative was discretionary.[16] As such, Respondent's election to continue signing non-emergency warrants while assigned to work at the Civil Courthouse did not violate Judge Waxman's policy, and Respondent's corresponding exception is sustained.

Otherwise, the Commission's factual findings regarding Respondent's handling of search warrant materials are supported by clear and convincing evidence in the record and, thus, are adopted by this Court. *See In re Bennett*, 301 Md. 517, 536, 483 A.2d 1242, 1251 (1984). When Judge Waxman testified before the Commission, she described the unsecure location where Respondent's boxes of warrants were located. Judge Waxman explained that "[t]he boxes were found in the law clerks' office; so [it wa]s not a secure area. It's not in a judge's chambers. It was on the floor. It could have been even mistaken as trash."

---

[16] The policy, according to Judge Waxman, provided that in exigent circumstances, an officer could come to the Civil Division at any time to have a warrant reviewed and signed. Warrants that were routine or non-exigent, however, would have to be reviewed and signed at another courthouse location. Judge Waxman explained that if a judge at Civil wanted to review warrants, he or she could do so. "But if there was a judge who looked at the warrant and said[,] 'This really isn't an emergency, please go to another court building,' he or she could."

24

The boxes were accessible by members of "[o]ther agencies in the building [that] use the copier, Legal Aid, Public Justice, mediators, everybody." Judge Waxman further testified that Respondent had not been working in the courthouse where the warrants were located and had been transferred nearly two months before they were found.

Furthermore, Judge Waxman attested to her personal examination of Respondent's nomad boxes. Judge Waxman explained that she sorted the documents in the boxes by year. Then she separated the warrants that had been executed and returned by a police officer – "the ones that should have been [processed]" with the clerk's office. In total, Judge Waxman identified and set aside "approximately 135" warrants dating from 2007-2015 that should have been "sent to the clerk's office" for filing.

Indeed, the warrants that Judge Waxman set aside were admitted into evidence at the disciplinary proceeding. Judge Waxman went through several of the exhibits, and she described their contents. Based on her testimony, the warrants had been executed; they were signed by an officer and detailed any inventory that was seized. As such, they "need[ed] to be filed with the" clerk. Md. Rule 4-601(g) (providing that executed warrants must be filed with the clerk of the court). Although Judge Waxman did not detail every warrant and its related documents, she affirmed that the exhibits that she described were representative of approximately 135 warrants from the nomad boxes that she had set aside.

Moreover, Ms. Asare testified that after Respondent instructed her to match up the warrants in her boxes, Respondent told Ms. Asare, "Just get rid of it." Ms. Asare interpreted Respondent's instruction as "asking [Ms. Asare] to destroy the warrants" in the nomad boxes – at least 135 of which needed to be filed with the clerk's office. Though

25

Respondent claims that Ms. Asare misunderstood her instruction, the Commission found Ms. Asare's testimony credible, and chose not to credit Respondent's testimony. The Commission, like the hearing judge in the analogous setting of Attorney Grievance Commission proceedings, must "pick and choose what evidence to believe." *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230, 198 A.3d 835, 847 (2018) (citation and internal quotation omitted). "The Commission was in the best position to evaluate [R]espondent's demeanor and we do not find [its] observations to be clearly erroneous." *See In re Lamdin*, 404 Md. 631, 655, 948 A.2d 54, 68 (2008). Therefore, we overrule Respondent's exceptions to the Commission's findings of fact with regard to Respondent's handling of warrants.

We now turn our attention to the Commission's conclusions of law. The Maryland Rules require judges to "perform judicial and administrative duties competently, diligently, and promptly[.]" Md. Rule 18-102.5(a). There is not a "rigid and finite formula" for determining whether a judge has competently, diligently, and promptly performed his or her duties. *See Matter of Reese*, 461 Md. 421, 441, 193 A.3d 187, 199 (2018) (holding that a judge did not violate Md. Rule 18-102.5 when she performed her judicial duties by appreciating the facts presented, understanding the applicable law, and drawing a reasonable conclusion). Here, however, Respondent utterly failed to fulfill her duty under Md. Rule 4-601 to file executed warrants with the clerk's office. She also admittedly failed to comply with the internal policy that prohibited a judge from signing a search warrant return for another judge unless the two judges were assigned to the same court when she handled a search warrant return for Judge Gordon. Moreover, her nomad boxes were kept

26

in a public area, accessible to numerous individuals inside and outside of the judiciary. Her inattention demonstrates a disregard for the critical nature of search warrants and her duties under Md. Rule 4-601.

To be sure, as Respondent contends, Md. Rule 4-601 does not establish a deadline or time period for when a judge must file a warrant with the clerk's office. *See generally*, Md. Rule 4-601. Respondent, however, cannot seek refuge in the Rule's lack of a deadline. The warrants in Respondent's nomad boxes dated back to 2007, and it became apparent in 2016 that she had neglected to file warrant materials with the clerk's office. As such, her conduct violated Md. Rule 4-601(g) – if not its tenets, then its spirit. Even though there is no strict deadline to which she must adhere, Respondent, at the very least, failed to file her warrants with the clerk of the court promptly. Md. Rule 18-102.5(a) (performing judicial and administrative duties competently, diligently, and promptly). Accordingly, we conclude that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.5 (Competence, Diligence, Promptness). We sustain the Commission's legal conclusions and overrule Respondent's exceptions thereto.

Finally, members of the judiciary who have supervisory control over other court employees must "require court staff . . . to act in a manner consistent with the judge's obligations[.]" Md. Rule 18-102.12(a). Judges "may not direct court personnel to engage in conduct on the judge's behalf . . . when such conduct would violate [the Code of Judicial Conduct] if undertaken by the judge." *Id*. (Comment 1). Although Respondent has apparently kept in her nomad boxes all of her warrants since becoming a judge, in 2016 she instructed a law clerk to destroy the contents of her nomad boxes. The evidence shows

27

that the boxes contained 135 executed search warrants. Respondent's duty was to promptly file the executed warrants with the clerk's office; she did not have discretion to destroy them. *See* Md. Rule 4-601; *see also* Md. Rule 18-101.1 (Compliance with the Law). Directing the law clerk to destroy them, however, would remove the existence of the executed warrants that Respondent had failed to file with the clerk. Respondent was not permitted to use a judicial law clerk, Ms. Asare, as an instrumentality for destroying evidence of her misconduct. *See* Md. Rule 18-102.12(a) (Supervisory Duties). When Respondent directed Ms. Asare to destroy the warrants, she ordered Ms. Asare to engage in conduct that contravened Respondent's own ethical obligations. In doing so, Respondent violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.12(a) (Supervisory Duties). For the foregoing reasons, we uphold the Commission's legal conclusions, and we overrule Respondent's exceptions thereto.

## 2. Interpersonal Issues

*The Commission's Findings of Fact and Conclusions of Law*

The Commission made several findings that related to instances where Respondent disciplined court staff. The Commission found that, in 2012, Respondent summoned Kim Brown ("Ms. Brown"), the Division Chief of the District Court, and Faye Walker ("Ms. Walker"), the Supervising Clerk for the District Court, to her courtroom at the Eastside Courthouse before the docket began, concerning a scheduling issue. "Respondent took Ms. Brown and Ms. Walker to a hallway outside of the courtroom and began to yell at them." She was yelling loudly enough that litigants and lawyers in the courtroom could hear the interaction, and the courtroom became silent as the incident occurred. The

28

Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-101.2(a) (Promoting Confidence in the Judiciary), and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

In addition, the Commission found that, in 2012, Respondent summoned Ms. Walker to her courtroom concerning a petitioner in a domestic violence case whose file was missing. "Respondent instructed Ms. Walker to escort the petitioner to the clerk's office to have a 'lineup' in an effort to determine which clerk had assisted the litigant and made the error regarding the missing file." The interaction was loud, in open court and in front of the litigant and members of the public. During the interaction, Respondent said, "So did you do it? Are you going to own up to it? No one is owning up to it? Somebody . . . did it. People aren't telling the truth." The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

Next, the Commission found that, in 2013, Respondent was discussing the clerical error in the domestic violence case with Ms. Brown and Ms. Walker. They were in the chambers of the Honorable Shannon E. Avery ("Judge Avery"), then-Associate Judge on the District Court and Judge in Charge of the Eastside Courthouse.[17] "Respondent was angry and all three [] raised their voices. Respondent said to both Ms. Brown and Ms.

---

[17] Judge Avery is currently an Associate Judge of the Circuit Court for Baltimore City. She began serving on the Circuit Court in 2014.

Walker[,] 'Your protection is gone. Lonnie (Ferguson, a previous administrative clerk) and Judge Hargrove aren't here anymore.'" Respondent acknowledged making this statement. The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

Finally, the Commission found that, in 2013, "Respondent intentionally pushed [Ms.] Brown while Ms. Brown was standing at the mail table at the Eastside District Court location." The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

In addition, the Commission made several factual findings regarding Respondent's interpersonal issues with other judges. In 2014, Judge Waxman, acting through the Honorable Halee F. Weinstein ("Judge Weinstein") who was the Judge in Charge of the Eastside District Court and Associate Judge on the District Court, asked Respondent not to call clerks into her courtroom to conduct lineups.[18] In response to Judge Weinstein's request, Respondent said, "You can't tell me what to do." The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-

---

[18] The Commission noted that there had been an additional instance where Respondent instructed a litigant to go to the clerk's office and identify the clerk who had given the litigant incorrect instructions. The Commission, however, did not find Respondent's conduct sanctionable. It merely referenced the incident to provide context for Judge Waxman's instruction to Respondent.

30

102.5(b) (Cooperation with other judges and court officials), and 18-102.5(c) (Compliance with administrative rules or reasonable directives of supervisors).

In 2015, Respondent began copying the Honorable Mary Ellen Barbera ("Chief Judge Barbera"), Chief Judge of the Court of Appeals of Maryland, "on emails concerning ongoing docket[s], chambers, [and] duty and leave assignments in [Respondent's] court." Chief Judge Morrissey of the District Court instructed Respondent to stop involving Chief Judge Barbera in the day-to-day internal management issues of the District Court because Chief Judge Morrissey is the administrative head of the District Court of Maryland. The Commission found that Respondent failed to comply with Chief Judge Morrissey's directive by continuing to copy Chief Judge Barbera on emails, even though she was instructed to stop. The Commission determined that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.5(c) (Compliance with administrative rules or reasonable directives of supervisors).

In April 2015, Respondent had a meeting with Chief Judge Morrissey. Chief Judge Morrissey had requested the meeting in order to ask Respondent to work to get along better with her colleagues. "Shortly after the meeting started, Respondent stood up and yelled, 'You threatened me[.]'" The accusation occurred within earshot of several employees and Respondent's husband, who were outside of the Chief Judge's office. The Commission found that there was, in fact, no threat to Respondent. Furthermore, the Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.8(b)

31

(Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity) because she was not cooperative, courteous, and dignified during her meeting with Chief Judge Morrissey.

In 2016, Respondent was assigned to assist in the orientation of the Honorable Katie M. O'Hara ("Judge O'Hara"), a newly appointed Associate Judge of the District Court. The Commission found that, while Respondent and Judge O'Hara were eating lunch together, Respondent said to Judge O'Hara, "[Judge Scurti, the [J]udge in [C]harge of the civil docket,] is not in charge of anything. Don't listen to him." Respondent also said "Judge Waxman (the Administrative Judge) is not your boss. You don't need to listen to her. You don't need to listen to Judge Morrissey (Chief Judge of the District Court)." The Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

In June 2017, Respondent entered the courtroom of Judge O'Hara through the public entrance, while a trial was underway, and "interrupted Judge O'Hara's ongoing court proceeding." She asked two attorneys, who were sitting at trial counsel tables, to get their calendars so they could schedule a specially set case. In addition to the lawyers, there were numerous litigants and witnesses present in the courtroom at the time. The interruption was recorded, and the exchange ran contrary to the process that has been established for

32

scheduling specially set cases.[19]  The Commission determined that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.5(c) (Compliance with administrative rules or reasonable directives of supervisors).

One day in 2017, the Honorable William M. Dunn ("Judge Dunn"), Associate Judge for the District Court, was temporarily designated as duty judge.[20]  Judge Dunn left the courthouse to get lunch before a noon meeting and when he returned, "Respondent was waiting for Judge Dunn as he came through the front door of the courthouse" in order to publicly chastise him.  Respondent "raised her voice, yelling and screaming at [Judge Dunn] in front of lawyers, bailiffs, and other judges about his departure from the courthouse [while] duty judge."  The Commission found that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.8 (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

In addition "in 2017[,] Respondent commented to several subordinate court employees including clerks and bailiffs, that 'Judge Waxman is a complete and utter incompetent vicious coward.'"  The comment was made in the hallway, and it was heard

---

[19] According to Judge Scurti, there is a policy requiring attorneys who wish to schedule specially set cases to speak with the clerk who is assigned to that task.  The policy ensures that the date on which the matter is scheduled is convenient for all of the parties.

[20] Judge Dunn explained during his testimony that "at each courthouse, one judge a day is asked to be duty judge."  The duty judge is tasked to "handle [any] emergencies [that come up] throughout the day."

by Judge Dunn as he was walking to chambers. The Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law) and 18-102.8 (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

On another occasion, Respondent went to Judge Scurti's office with a bailiff and a court clerk. Judge Scurti's office door was closed, yet Respondent entered unannounced and uninvited and "proceeded to yell and scream at Judge Scurti." At the time, the Honorable David B. Aldouby ("Judge Aldouby"), Associate Judge of the District Court, was in Judge Scurti's office, and witnessed the interaction. Neither Judge Scurti nor Judge Aldouby could remember about what Respondent was upset. The Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

Finally, the Commission found that "Respondent yell[ed] at Judge Weinstein[,]" the Judge in Charge of the Eastside Courthouse, while discussing Respondent's docket. The yelling occurred "in front of court staff, as well as Judge Aldouby," who was in Judge Weinstein's chambers at the time. The Commission concluded that Respondent's conduct violated Md. Rules 18-101.1 (Compliance with the Law), 18-102.5(b) (Cooperation with other judges and court officials), and 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity).

34

*Respondent's Exceptions to the Commission's Findings of Fact and Conclusions of Law*

In essence, the Exceptions reflect that Respondent views herself as the victim and a problem solver. She asserts that members of the District Court's administrative staff, including Ms. Brown and Ms. Walker, simply do not like her. Respondent characterizes her conduct as solving problems, ensuring competent, efficient service to the public, and engaging in "lively discussion." Respondent maintains that her actions did not constitute sanctionable conduct.

Respondent denies the allegation that she failed to comply with a reasonable directive of a judicial supervisor. Respondent contends that there are interpersonal relationship issues among the judges of the District Court, and her colleagues have rebuffed her efforts to work through their differences. She argues that "hurt feelings, the silent treatment, the ending of friendships, being hard to get along with, and other interpersonal interactions between judges is not sanctionable conduct for which discipline should be imposed."

## *Discussion*

Having reviewed the record, we conclude that the Commission's factual determinations are supported by clear and convincing evidence. *See In re Bennett*, 301 Md. 517, 528-29, 483 A.2d 1242, 1247-48 (1984). Notably, although Respondent views her conduct as appropriate under the Maryland Rules, she does not provide a basis for concluding that the Commission's factual findings are erroneous. As such, we sustain the Commission's factual findings, and overrule Respondent's exceptions thereto.

35

We now turn our attention to the Commission's conclusions of law. Under Md. Rule 18-102.5, judges are required to interact with others in a cooperative and respectful manner. *See In re Lamdin*, 404 Md. 631, 650-52, 948 A.2d 54, 65-66 (2008). Judges must also be "patient, dignified, and courteous to . . . court staff, court officials, and others with whom the judge deals in an official capacity[.]" Md. Rule 18-102.8(b). Similarly, judges must refrain from "willfully fail[ing] to comply with administrative rules or reasonable directives of a judge with supervisory authority." Md. Rule 18-102.5(c). "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary." Md. Rule 18-101.2(a). A judge may be disciplined if he or she makes inappropriate comments and uses vulgar language in the courtroom, criticizes colleagues in public, and speaks discourteously toward litigants. *See Lamdin*, 404 Md. at 650-52, 948 A.2d at 65-66. "No matter how frustrated or stressed a judge may be, a judge should not use vulgar or offensive language in the courtroom or in the performance of judicial duties." *Id*. at 651, 948 A.2d at 66. Such conduct "lack[s] dignity, courtesy, and patience" and "erode[s] the public trust and confidence in the Judiciary." *Id*.

When handling clerical errors, Respondent failed to maintain an equanimous demeanor. Lacking a modicum of civility, Respondent was eruptive, disrespectful, and demeaning toward courthouse staff. Respondent yelled at, accused, and humiliated staff members. She physically shoved an employee of the judiciary, Ms. Brown. Respondent's erratic behavior occurred in front of litigants and lawyers. Likewise, Respondent repeatedly yelled at her colleagues, and did so in front of other judges, court staff, and members of the public. She interrupted an ongoing trial presided over by another judge to

36

address a scheduling matter, which not only violated internal operating procedures, but disturbed the ongoing proceedings in that court. On multiple occasions, Respondent defied the directives of administrators and supervisors, and even attempted to undermine their authority. On one occasion, Respondent accused her Chief Judge of threatening her without cause.

Respondent exhibited a pattern of divisive, combative, and volatile interpersonal issues. Her conduct is unbecoming of a member of the judiciary, and it fails to maintain the demeanor that our Rules require of judges. *See Lamdin*, 404 Md. at 648-52, 948 A.2d at 64-66 (speaking inappropriately toward and criticizing colleagues while performing judicial duties violates the Rules). This Court agrees that Respondent's conduct violated Md. Rules 18-102.5(b) (Cooperation with other judges and court officials), 18-102.8(b) (Patient, dignified, and courteous demeanor toward others with whom the judge deals in an official capacity), 18-101.2(a) (Promoting Confidence in the Judiciary) and 18-101.1 (Compliance with the Law). We, therefore, uphold the Commission's conclusions of law and overrule Respondent's exceptions thereto.

### Sanction

Under our State Constitution, we may impose a sanction against a judge for his or her conduct "upon a finding of misconduct while in office, or of persistent failure to perform the duties of the office, or of conduct prejudicial to the proper administration of justice." Md. Const. Art. IV, § 4B(b)(1); *see also* Md. Rule 18-401(k). "A judge's violation of any of the provisions of the Maryland Code of Judicial conduct promulgated by Title 18, Chapter 100 may constitute sanctionable conduct." Md. Rule 18-401(k). We

37

have concluded that where a judge repeatedly exhibits an inappropriate demeanor, lacking dignity, courtesy, and patience, the judge's conduct is sanctionable because it is prejudicial to the administration of justice. *Lamdin*, 404 Md. at 650, 948 A.2d at 65. In addition, "critici[zing] judicial colleagues, particularly from the bench in the courtroom, hardly leads to trust and confidence by the public in the Judiciary." *Id*.

We adopt the Commission's conclusion that Respondent committed sanctionable conduct. Respondent's pattern of misbehavior was prejudicial to the administration of justice and therefore warrants sanction. *Id.* The record reflects that commencing in 2007, Respondent failed to properly handle and process search warrants and related materials in accordance with her judicial duties prescribed by Md. Rule 4-601 and courthouse procedures, all the way through 2015 – a span of about eight years. Testimony at the hearing indicated that no less than 135 warrants were not processed due to Respondent's failure to comply with the applicable rules and procedures. Moreover, the interpersonal issues spawned by Respondent's misconduct involved both verbal and physical confrontations with courthouse staff. Her interpersonal conflicts were not limited to encounters with courthouse personnel, but also occurred between fellow judges. Respondent's conduct included yelling at other judges, both in chambers and in locations where she could be overheard by employees of the judiciary and members of the general public. Respondent went so far as to attempt to undermine judges with administrative authority. There is evidence that, beginning in 2014, Respondent engaged in undignified confrontations and misbehavior with judges and court personnel on no less than 13 occasions in three years (2014-2017).

Respondent denies that any of her conduct is sanctionable.  To support her position, Respondent repeatedly points to things that she did *not* do.  For instance, she did not refuse a transfer to a new court location, accept a bribe or gratuity, or engage in improper *ex parte* communications.  The fact that Respondent did not commit certain forms of misconduct does not absolve her of the repeated and serious instances of her misbehavior.  Respondent also posits that there is no evidence that her conduct adversely impacted any civil or criminal case.  Although we accept Respondent's assertion, neither the Rules nor the Constitution require that her conduct implicate a particular case in order to sanction judicial misconduct.  Significantly, however, the Commission found that Respondent's behavior negatively impacted the daily operations of the court in Baltimore City.

In addition, Respondent argues that the matter before this Court presents mere personality disputes, which are not sanctionable.  We disagree with Respondent's characterization of this case.[21]  "We recognize that judges differ in both style and personality and that these qualities, in and of themselves, are not matters for discipline."

---

[21] We take this opportunity to emphasize that Respondent's misconduct did not amount to mere personality disputes.  Such a factual pattern would not qualify as sanctionable conduct and require intervention by either the Commission or this Court.  To maintain a judicial temperament, a judge need not be constantly affable and loquacious.  Judges may engage in genuine disagreements and lively discussions with fellow judges and courthouse staff; and judges may disagree or be incompatible with colleagues.  Each case must be considered on its own facts to determine whether a judge's conduct has exceeded the bounds of a permissible judicial temperament.  Here, Respondent has unrelentingly exhibited a pattern of discourteous and disrespectful behavior.  Taken in isolation, any single instance of Respondent conflicting with her colleagues would likely not amount to sanctionable conduct. Taken together, however, the unyielding pattern of Respondent's conduct has fostered a toxic environment in the District Court, and it leads this Court to conclude that her conduct is sanctionable.

*Disciplinary Counsel v. O'Neill*, 103 Ohio St. 3d 204, 213 (2004). Nonetheless, "patience, dignity and common courtesy are essential parts of judging, whatever the personality of the judge, and a pattern of judicial discourtesy represents a profound threat to the institution of the law and requires a strong response." *Id*. (citation and internal quotation marks omitted). Respondent, indeed, has exhibited a pattern of incivility that has had demonstrated adverse effects on the District Court where she sits. The Commission has pointed to 15 judges and several members of the courthouse staff who came forth to testify in this proceeding about Respondent's behavior from 2007-2015. Her colleagues identified no less than 13 instances in three years (2014-2017) where Respondent exhibited disrespectful and demeaning behavior, many instances of which were in public. Her conduct resulted in a toxic environment. Collectively, her colleagues described that, when working in the same courthouse as Respondent, the atmosphere was hostile, tense, dysfunctional, stressful, and unpleasant. They explained that when Respondent is in the vicinity, judges tend to keep to themselves, close their doors, and "[e]verybody is walking on eggshells." Her conduct, according to her District Court colleagues, "has created . . . a division and divide among [their] bench."

The supervisors who serve on Respondent's court have attempted to remedy administratively the situation. Chief Judge Morrissey met with Respondent in April 2015 and asked her to work to get along with her colleagues. Respondent failed to adjust her behavior. Chief Judge Morrissey also sought recourse with the human resources department, and eventually he arranged for mediation to be held between Respondent and one of her colleagues. Again, Respondent failed to adjust her behavior. Despite his efforts,

40

Chief Judge Morrissey received information from more than a dozen District Court judges who indicated that they were in contentious relationships with Respondent. Respondent has demonstrated a pattern of violating the Maryland Rules. Her misconduct has fostered an uncomfortable work environment in the District Court, yet Respondent has maintained an unwillingness to alter her conduct. The widespread effects that her misbehavior has had on the administration of justice warrants this Court's sanction.

Turning our attention to the Commission's sanction recommendation, the Commission recommended that Respondent be suspended from her position as an associate judge for six months. At oral argument, the Commission made clear its intention that the suspension be served without pay. In addition, the Commission recommended that Respondent "undertake such remedial measures as this Court recommends to assist her, and the District Court . . . as [Respondent] returns to her duties." In addition to its findings of fact and conclusions of law, the Commission provided the Court with a detailed list of factors that informed its recommendation as to the appropriate sanction. The list is attached hereto in an Appendix.

The Commission's recommendation is entitled to great weight. *Lamdin*, 404 Md. at 652, 948 A.2d at 66. This Court, however, is not bound by the Commission's recommendation. *See id.*; *see also* Md. Rule 18-408(e). "[I]t is incumbent upon this Court to make an independent assessment of the appropriate sanction." *Lamdin*, 404 Md. at 653, 948 A.2d at 66 (citing *In re Diener and Broccolino*, 268 Md. 659, 683, 304 A.2d 587, 600 (1973)). In fashioning a sanction, we consider the broad circumstances surrounding each particular case. *See* Md. Rule 18-100.1(b)(1)(B). For instance, we consider "the

41

seriousness of the transgression, the facts and circumstances at the time of the transgression, the extent of any pattern of improper activity, whether there have been previous violations, and the effect of the improper activity upon the judicial system or others." *Id.*

We are also mindful of the purpose of disciplining judges for judicial misconduct. The purpose is not to punish. *Lamdin*, 404 Md. at 653, 948 A.2d at 66. "It is the constitutional responsibility of this Court to fashion judicial discipline in a manner that preserves the integrity and independence of the Judiciary and reaffirms, maintains and restores public confidence in the administration of justice." *Id.* at 652, 948 A.2d at 66. In this opinion, we strive to further the judiciary's goal of preserving the principles of justice and impress upon the public and the judiciary that judicial misconduct will not be condoned. In addition, we seek to deter the sanctioned judge and other members of the judiciary from engaging in similar conduct.

In many respects, the present case may be likened to *In re Lamdin*. 404 Md. 631, 948 A.2d 54. There, the Honorable Bruce S. Lamdin used vulgar language and criticized colleagues while presiding over cases. *Id*. at 637-50, 948 A.3d at 57-65. We explained that Judge Lamdin's use of inappropriate language was prejudicial to the administration of justice. *Id*. at 650, 948 A.2d at 65. Judge Lamdin sought to mitigate his misbehavior by "s[eeking] guidance from his colleagues and under[going] voluntary monitoring when the Judicial Disabilities Commission charges were brought to his attention." *Id*. at 654, 948 A.2d at 67-68. Even so, he made excuses for his misbehavior in a way that was defensive

42

and hostile. *Id*. at 654, 948 A.2d at 68. Ultimately, this Court suspended Judge Lamdin for 30 consecutive days without pay. *Id*. at 655, 948 A.2d at 68.

Not unlike *Lamdin*, Respondent exhibited a broader pattern of misbehavior. *See id*. She neglected her responsibilities concerning search warrants from, at least, 2007-2015. Likewise, the Commission's findings encompassed interpersonal disputes that spanned from 2014-2017. Although, Respondent's misconduct did not occur while she was presiding over cases on the bench, distinguishing this case from *Lamdin*, every instance of her irate misbehavior occurred at the courthouse and many outbursts occurred in the presence of the public. Above and beyond the behavior that we reviewed in *Lamdin*, her misconduct had sweeping effects on the morale and working relationships between judges and courthouse staff. She rejected the authority of her supervisors and often attempted to undermine their authority and directions.

We also take under consideration, as mitigating factors, that Respondent apparently has changed prospectively the way that she processes, handles, and stores search warrants and has assisted her colleagues by "pulling cases" from them to assist with the flow of the dockets. Respondent also called witnesses who testified to her skills as an appellate lawyer, and she produced letters of support written on her behalf when she sought higher judicial office in 2016. Notwithstanding the mitigating factors, Respondent's misconduct created, over a long period of time, a pervasive, unyielding and serious pattern of disrespectful and blatant disregard for the dignity of Maryland jurists. Indeed, the Commission was not relieved by Respondent's attempts at mitigation. As the Commission found, even Respondent's witnesses acknowledged the tense and unpleasant work environment among

43

judges in the District Court when Respondent is present. Accordingly, we endeavor to intervene and restore as best we can the public's trust and confidence in the judiciary. In attempting to restore public trust and confidence, we are concerned that Respondent has yet to express remorse for her misbehavior or acknowledge any wrongdoing. Instead of admitting to her mistakes and seeking help to improve her behavior, she places blame on others and plays the role of the victim. Respondent fails to recognize the deleterious effects that her misconduct has had on the operation of the District Court and, thus, the severity of her wrongdoings.

The Commission asked this Court to impose a sanction that will aid Respondent and the District Court as she returns to her duties. The Commission's recommendation and the testimony of Respondent's colleagues begs for assurances that Respondent will meaningfully change her behavior. In determining how to best effectuate the change, we, like the Commission, are confounded as to whether Respondent is unable or merely unwilling to change her behavior. The Commission found it significant that one of Respondent's supervisors expressed concern for Respondent's mental wellbeing.

We look to the many outbursts and unprovoked intemperate actions of Respondent as evidence of a potential behavioral cause for her misconduct that would be best addressed by health care professionals. *See O'Neill*, 103 Ohio St. 3d at 216 (In determining the appropriate sanction, the court considered, among many factors, the judge's "repeated volatile outbursts and unprovoked intemperate actions evidence a potential behavioral cause for her misconduct" that persuaded the court to obtain the evaluation of a mental health professional as a condition precedent to reinstatement and to help explain the reason

44

for the judge's misconduct); *see also Atty Griev. Comm'n v. Shuler*, 443 Md. 494, 511, 117 A.3d 38, 49 (2015) (noting that in imposing conditions to reinstatement the Court is not determining that the lawyer has a mental or physical condition; it is seeking additional information in furtherance of the Court's goals to protect the public and the public's confidence in the legal profession by requiring, as a condition precedent to reinstatement, evidence that the lawyer is mentally and physically competent to resume the practice of law.). We do not conclude as a matter of fact or law that Respondent has a mental or physical condition that is contributing to her misconduct. Rather, we are persuaded that additional information from a health care professional or professionals will furnish the Court with necessary assurances that will guide the reinstatement process and help restore the public's trust and confidence in the judiciary.

After a careful, independent review of the record, we conclude that the Commission's recommended sanction is appropriate for Respondent's misconduct. *See* Md. Const. Art. IV, § 4B(b)(1) (vesting this Court broad discretion to "remove [a] judge from office or . . . censure or otherwise discipline [a] judge[.]"). We, therefore, suspend Respondent for six months without pay from her service as a judge of the District Court, to commence on July 1, 2019. We set as conditions precedent to Respondent's reinstatement of her duties as a judge that Respondent shall: (1) submit to a health care evaluation, to be performed by a qualified health care professional or professionals who are acceptable to the Commission and, ultimately, this Court, for a complete emotional and behavioral assessment; (2) fully cooperate in the health care evaluation and comply with the recommended course of treatment, including counselling, if any; and (3) if and when

45

Respondent applies for reinstatement, she shall provide, to the Commission and ultimately this Court, a written report from the evaluating health care professional or professionals as to her current medical condition, including any reason for which she should not be reinstated as a judge of the District Court. In addition, Respondent's reinstatement is conditioned upon her satisfactory completion of an approved course on judicial ethics as recommended by the Commission.[22]

**IT IS SO ORDERED; THIS ORDER IS EFFECTIVE BEGINNING ON JULY 1, 2019; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS.**

---

[22] This Court and courts from other jurisdictions have previously imposed a sanction with conditions for reinstatement with respect to judges and in the analogous context of attorney disciplinary proceedings. *See, e.g.*, *Attorney Grievance Comm'n v. Christopher*, 383 Md. 624, 649-50, 861 A.2d 692, 707 (2004) (requiring, as a condition to his reinstatement to the bar, that the attorney provide a signed statement from a qualified health care professional, certifying that he is mentally and physically competent to practice law and is receiving treatment); *Attorney Grievance Comm'n v. Schuler*, 443 Md. 494, 513, 117 A.3d 38, 50 (2015) (imposing a sanction of suspension from the practice of law for thirty days, with a condition precedent that the attorney satisfactorily demonstrate that he is mentally and physically competent to resume the practice of law). *See also Disciplinary Counsel v. O'Neill*, 103 Ohio St. 3d 204, 216 (2014) (imposing a two-year suspension with one year stayed on the condition that the judge, *inter alia*, submit to a mental health evaluation to be performed by the health professional of her choice and fully cooperate with any recommended course of treatment); *In re Case of Snow*, 140 N.H. 618, 628 (1996) (suspending a judge for six months without pay, and requiring the judge, "[a]s a condition of his reinstatement . . . [to] complete successfully a comprehensive course in judicial ethics, to be approved in advance by [the Supreme Court of New Hampshire]."); *Matter of Templeton*, 99 N.J. 365, 378 (1985) (suspending an attorney for five years and conditioning his reinstatement upon the attorney "1. be[ing] evaluated psychiatrically as to his continued mental and emotional stability; 2. cooperat[ing] fully with such an examination; [and] 3. continu[ing] any course of psychiatric counseling that might be recommended for as long as may be necessary[.]"); *In re Gates*, 686 So.2d 816, 816 (1997) (suspending an attorney for one year, with his reinstatement conditioned upon him "seeking counseling and treatment for his avoidance problem" in a reciprocal disciplinary matter).

46

III. [THE COMMISSION'S] CONSIDERATIONS REGARDING THE IMPOSITION OF DISCIPLINE.

A. As to the appropriate discipline in a judicial conduct case, the Commission is guided by the General Provisions of the Maryland Code of Judicial Conduct, Maryland Rule 18—100.1(b)(1)(B), which provides:

> Whether discipline should be imposed should be determined through a reasonable and reasoned application of the Rules and should depend upon factors such as the seriousness of the transgression, the facts and circumstances at the time of the transgression, the extent of any pattern of improper activity, whether there have been previous violations, and the effect of the improper activity upon the judicial system or others.

Additionally, the Commission finds significant the following behaviors and comments which, while not sanctionable conduct by the clear and convincing standard, helped inform the Commission's recommendation as to the appropriate sanction.

A. Interrupting Judge Waxman during a social event while Judge Waxman was talking with a colleague as Respondent "put her arm in between us, and she literally pushed me back two steps in order to interrupt a conversation I was having with a colleague, almost knocked me [Judge Waxman] over" (Transcript pp. 464-65);

B. Continually arriving late to court without informing anyone that she will not be on time;

C. Respondent saying "Which broom Closet is she putting me in today?" (Transcript p. 464), "Where am I today? In a closet? In the lockup?" to various judicial assistants upon arrival at different court locations for her daily assignments (Transcript p. 744);

D. Saying "l didn't know you were such a good writer", to Judge Rachel Skolnik, after learning that Judge Skolnik authored a response signed by fourteen colleagues to Respondent's "open letter" to the District Court bench (Transcript p. 697);

E. "You better be careful because warrants might end up getting shredded or put in the trash", Respondent, to a police officer, in the presence of Judge Skolnik (Transcript p. 699);

F. Advising Judge Waxman that she would not comply with the deadline to request annual leave;

G. "I drive past the other judge's house at 11 o'clock at night to look and see whose vehicle is in the driveway", stated by Respondent to Judge Gordon, in detailing a rumor concerning a colleague's alleged infidelity (Transcript p. 822);

H. "I'm shredding, I'm shredding. Look, I'm shredding", Respondent's comments to

court staff after the charges in the current matter became public (Transcript p. 464);

I. Respondent, while in her vehicle, hit Judge Gordon's car in March 2015, causing damage, minutes after a conversation in which Judge Gordon asked Respondent to stop some of her behaviors. Respondent provided insurance claim information to Judge Gordon and indicated the impact was not intentional;

J. "Are you going to get dressed up (in a Halloween costume)?" to Judge Scurti during a bench meeting in October 2018, after the first week of this proceeding had taken place (Transcript p. 1236);

K. Judge Weinstein sitting in the clerk's office at Eastside Courthouse to prevent any confrontation between clerks and Respondent;

L. Judges hastily moving their cars to accommodate Respondent when she is expected at a court location.

The Commission took note of the atmosphere described by nearly every judge – even Respondent's own witnesses — in each court location that exists when Respondent is assigned to sit at said location.

Those comments include:

Judge Aldouby: "If I were blindfolded and brought to a building, I could tell you . . . whether Judge Russell was assigned to that courthouse that day. There is a certain chill that is there." (Transcript pp. 764-65) "It's gotten worse in recent years . . . it's walking on eggshells and you're just praying that it's a good day and that there is no conflict (with Respondent)" (Transcript p. 765); "There's situations where it has just been openly hostile (Respondent's conduct), like what I saw in Judge Scurti's Chambers" (Transcript p. 778);

Judge Scurti: "Judge Russell has created such a division and divide among our bench" (Transcript p. 163); "Everybody is walking on eggshells, from bailiffs to clerks to other judges. And it is just not a pleasant situation." (Transcript p. 163);

Judge Waxman: "I would describe (Respondent) as seeming to enjoy hurting other people on the bench, openly hostile at times, rude, intimidating, taking joy when other judges would have negative things said about them in the press, disrespectful." (Transcript p. 467);

Judge Skolnik: "I shut my door 90% of the time (when Respondent is in that courthouse) . . . I don't want to hear the comments, and I don't want to respond." (Transcript p. 701); She is "mean spirited, argumentative, and unprofessional"; (Transcript p.702);

Judge Avery: "I repeatedly asked Judge Waxman to essentially take Judge Russell off of the dockets at Eastside District Court." (Transcript p. 723);

2

Judge Weinstein: "Judge Russell creates a hostile work environment." (Transcript p. 743); and "She yells at me in front of staff' (Transcript p. 743);

Judge Kevin Wilson: "Uncomfortable, the comments that she makes under her breath . . . it just makes it for a very intense, uncomfortable situation", in describing bench meetings with Respondent present (Transcript p. 794);

Judge Jennifer Etheridge: "(She goes from) zero to sixty immediately" (Transcript p.889);

Judge Kathleen Sweeney: "People are always concerned about what she might do next . . . She was constantly egging people on. She was trying to get reactions out of people" (Transcript p. 812);
Judge Gordon: "The interactions are never pleasant between the two of them (Respondent and Judge Scurti). The unpleasantness is always one-sided, and it just makes everyone tense. She will frequently sit directly across from him at bench meetings and just stare at him" (Transcript p. 843); and "People tend to just walk away (from Respondent) and stop congregating or talking to each other and go into their rooms. Some judges have started to keep their doors closed because they just don't want to hear the acrimony" (Transcript p. 844); and "She turns petty things into major things, and private issues into court issues";

Judge James Green: "(Judge Russell's conduct) has created an atmosphere that is nothing short of dysfunctional . . . It has created open hostility, open challenge of authority, open challenge of rules, and it is very difficult conduct to deal with. I look at the calendar every day . . . to see where my colleague Judge Russell is assigned, because I have to prepare my day" (Transcript pp. 931-32); and in describing why he wrote a letter to Chief Judge Morrissey concerning Judge Russell's conduct: "I have an obligation under the rule, as a judge, to report what . . . I perceive to be misconduct if it has gotten to a point where it potentially doesn't show a fitness . . . my letter was drawn from that" (Transcript p. 931);

Judge O'Hara: "On days that Judge Russell is at the Eastside Courthouse, there is kind of a cloud of concern or cloud of angst. . . Several of my colleagues and particularly the staff, administrative staff, are concerned about the day" (Transcript pp. 1026-27);

Chief Judge Morrissey: "I was concerned that someone would write an open letter actively antagonizing the entire rest of her court, and I thought maybe something was mentally wrong" (Transcript p. 1008);

Comments of significance from clerical witnesses include:

Kim Brown: "(Respondent) had continued to do little things that I just chalked it up as her just being very immature and unprofessional. The whole time everything was unprofessional" (Transcript p. 612); "I had had enough of Judge Russell . . . She was out of control" (Transcript p. 613); "l felt very stressed" (Transcript p. 617);

Faye Walker: "I have to avoid walking down a hall just in case (Respondent) is coming through with the bailiffs to go to her courtroom . . . she would have this strange laughter when she encounters me" (Transcript p. 662); "I just avoided her when she was in the building . . . we did not want to be singled out in a courtroom and embarrassed in front of the citizens or our coworkers"; "Never (had similar interactions with any other judge of the bench)" (Transcript pp. 662-65);

Tracey Whye: "I can tell you that there are individuals who may not come through chambers when they know (Respondent) is on the roster for the day." (Transcript p. 230).

And Respondent's own witnesses:

Judge Cooper: "With some staff. . . she has a good reputation. With other staff, it's not so good" (Transcript pp. 1046-47);

Judge Boles: "People watch what they do and say." (Transcript p. 1238); and "It made it very unpleasant" describing a comment made by Respondent to Judge Scurti, during a bench meeting in October 2018 (Transcript p. 1236);

Judge Baylor Thompson; "There was one letter [open letter to all her colleagues, IC Exhibit 11] that was written to all of the judges, and I thought it was a little insulting to one of my colleagues" (Transcript p. 1256);

Judge Dorsey: "The atmosphere is tense (when Respondent is present) . . . Colleagues tend to keep to themselves . . . they tend to close their doors" (Transcript p. 1267);

Judge Jack Lesser: "I am always thinking is this the day something is going to happen" (Transcript not available as Judge Lesser testified via a video deposition).

The Commission has no doubt that this difficult, uncomfortable, tense and unprofessional work environment is created by Respondent and her behavior. The Commission finds it significant that these above behaviors have resulted in the loss of very close friendships between Respondent and Judge Avery, Judge Gordon and Judge Weinstein, respectively, and ended the "warm, cordial friendship" Respondent had previously enjoyed with Judge Waxman.

4

The Commission also finds informative the comments expressed by Chief Judge Morrissey in that he is "concerned for Judge Russell's mental well-being" and that he is "out of options" in describing his ability to address the situation in Baltimore City. The Commission is also not able to determine whether Respondent is unable or merely unwilling to change her behavior, but has no doubt that her behavior greatly impacts the daily court operations in Baltimore City.

The Commission has found that the comments and behaviors of Judge Russell were undignified, uncooperative. discourteous, demeaning, and clearly demonstrate a pattern of serious violations of the Maryland Code of Judicial Conduct that strike at the very heart of the integrity of the judiciary and the public's confidence in such integrity.

B. The Commission considered the testimony of Chief Judge Joseph F. Murphy, Retired, the character witness offered by Judge Russell, who described the Respondent as "an excellent appellate lawyer, both as a member of the Public Defender's office and the Attorney General's office".

Judge Murphy seemed unfamiliar with some of the behavior of Respondent as described by her colleagues during the hearing. When questioned, Judge Murphy suggested that some of the information, if true, would give him pause, and perhaps change his opinion. "Yes (my opinion of Respondent's character would be changed if I knew she intentionally damaged another judge's car)." (Transcript p. 1292); (See also Transcript pp. 1290-94).

C. The Commission carefully considered the evidence, witnesses and testimony of Respondent, which included her explanations for the numerous incidents detailed before the Commission by her colleagues, subordinates and superiors, and her stated belief that the issues of concern in the Baltimore City District Court began in 2015. Respondent was unable to identify anything she would change or do differently concerning nearly every one of the incidents described herein. Respondent acknowledged engaging in various of these behaviors, but expressed no regret. (Transcript pp. 1661-1684) She fails to see herself as the common denominator in these incidents; she blames others and takes no responsibility for her actions. The Commission has no doubt that Respondent is volatile, unpredictable, and responsible for the enormously difficult work environment in the Baltimore City District Court.

Additionally, the Commission reviewed letters of support written on behalf of Judge Russell from her 2016 quest for higher judicial office, and Judge Russell's prior contacts with the Commission on Judicial Disabilities once the Commission determined sanctionable conduct occurred

Subsequent to the Hearing, the Commission reviewed proposed Findings of Fact and Conclusions of Law submitted by Judge Russell and Investigative Counsel. Judge

5

Russell has made no recommendation of a sanction, in that she denies committing sanctionable conduct. Investigative Counsel also makes no specific recommendation as to an appropriate sanction, deferring to the Commission.

The Commission hereby refers this matter to the Court of Appeals with a recommendation to impose the discipline set forth in Paragraph IV, B.2, m. In the Commission's view, the imposition of a public reprimand is not commensurate with the serious violation of misconduct in office committed by Judge Russell and does not reassure the public, her colleagues and co-workers that Judge Russell will be deterred from engaging in similar behavior in the future. The Commission concludes that the gravity of the Code violations require the imposition of a significant sanction.

The Commission did, however, consider several mitigating factors presented by Judge Russell, through counsel, at the Hearing in determining its recommendation as to the appropriate discipline. The Commission found it persuasive that Respondent has changed the way she processes, handles and stores warrants. (Transcript p. 1680) The Commission also notes that Respondent has become more helpful to her colleagues in terms of "pulling cases", even if such helpfulness is self-serving. The Commission concludes that its recommendation of a lengthy suspension is commensurate with the gravity and pervasive nature of Judge Russell's misconduct and the extent to which it jeopardizes the integrity and dignity of the judiciary and the public's confidence in such integrity and dignity. The Commission strongly considered recommending various courses of instruction or remediation for Respondent during this period of suspension, but will not make such recommendation given this Court's opinion in Matter of Reese for Howard Ctv., Tenth Judicial Circuit, 461 Md. 421 (2018), reconsideration denied (Oct. 15, 2018).